**James MOODY, Trustee of the Estate of Jeannette Corporation, et al., Plaintiffs,**

v.

**SECURITY PACIFIC BUSINESS CREDIT, INC., et al., Defendants,**

v.

**Frank W. STOREY and Calvin McCracken, individuals, Third–Party Defendants.**

Civ. A. No. 83–2383.

United States District Court, W.D. Pennsylvania.

May 29, 1991.

David J. Armstrong, George E. McGrann, Dickie, McCamey & Chilcote, Pittsburgh, Pa., Philip M. Halpern, Collier, Cohen, Shields & Bock, New York City, for defendants, Coca Cola of New York and KNY Development.

W. Woodruff Turner, Robert B. Sommer, Terry Budd, Kirkpatrick & Lockhart, Pittsburgh, Pa., for defendants, John P. Brogan, John J. Brogan, Hanley Dawson, Jr., Hanley Dawson III, James McLean, James R. Winoker, J. Corp., Inc. and Muench–Kreuzer Candle Co.

Robert L. Potter, Frank R. Arcuri, Strassburger, McKenna, Gutnick & Potter, Pittsburgh, Pa., for third-party defendant, Frank W. Storey.

Grace S. Harris, Pittsburgh, Pa., for third-party defendant, Calvin D. McCracken.

## OPINION

DIAMOND, District Judge.

*Introduction*

More than eighty years after the founding of its predecessor company, the Jeannette Corporation (sometimes hereafter "Jeannette") suffered an economic decline and bankruptcy in late 1982 from which it never recovered. Plaintiff, James Moody, Trustee of the bankruptcy estate, instituted this action to recover in excess of $12 million from the participants of a leveraged buyout of Jeannette that took place on July 31, 1981.

Plaintiff contends in this suit that the July 31, 1981, transaction was a fraudulent conveyance under the Pennsylvania Uniform Fraudulent Conveyance Act ("Pennsylvania Act") and the fraudulent conveyance provisions of the United States Bankruptcy Code. He also claims, *inter alia*, that certain of the defendants engaged in an unlawful dividend and/or distribution of Jeannette's assets, in violation of 15 Pa. Stat. §§ 1701, 1702.

On August 16, 1990, we concluded a five-week bench trial on Counts Two, Three, Five and Eight, the counts of the ten-count

Robert J. Cindrich, David B. Mulvihill, Manning J. O'Connor II, Mansmann Cindrich & Titus, Douglas A. Campbell, Stanley E. Levine, Campbell & Levine, Pittsburgh, Pa., for plaintiffs.

James D. Morton, George L. Cass, Buchanan Ingersoll, P.C., Pittsburgh, Pa., William F. Lloyd, Michael J. Sweeney, Sidley & Austin, Chicago, Ill., for defendant, Security Pacific Business.

amended complaint raising these issues.[1] In our findings of fact, conclusions of law and discussion below, we will set forth in detail our reasons for concluding that plaintiff has failed to establish that the July 31, 1981, transaction involved fraudulent conveyances or that any defendant authorized an unlawful dividend or distribution of Jeannette's assets. First, we summarize briefly the facts of the case and our conclusions of law.

Jeannette Corporation had its origin as Jeannette Glass Company, which was founded in 1898. Although glassmaking always remained one of Jeannette's principal businesses, it also manufactured and sold candles, ceramics, china and plastic housewares through several divisions and subsidiaries.

Maurice L. Stonehill controlled Jeannette from 1960 until it was purchased in 1978 by defendants Coca–Cola Bottling Company of New York, Inc. (sometimes hereafter "Coke of New York" or "Coke") and KNY Development Corporation (sometimes hereafter "KNY Development" or "KNY").

Coke and its subsidiary KNY purchased all of the stock of Jeannette in 1978 for nearly $40 million. After operating the company for two years with disappointing results, Coke put it on the market. Coke reached an agreement in principle to sell the company to one buyer for $19 million, but that sale was never consummated. Subsequently, on July 31, 1981, Coke and KNY sold Jeannette Corporation for $12.1 million to J. Corp., a holding company controlled by an investor group headed by defendant John P. Brogan. The Brogan group borrowed $11.7 million of the purchase price from defendant Security Pacific Business Credit, Inc. (sometimes hereafter "Security Pacific") through a transaction structured so that the loan ultimately was secured by a lien on all of Jeannette's assets. After some fifteen months under the Brogan group, a creditor of Jeannette filed an involuntary petition in bankruptcy against it under Chapter 7 of the Bankruptcy Code.[2]

We conclude, first, that the conveyances involved in the July 31, 1981, leveraged buyout of Jeannette Corporation were not intentionally fraudulent.

In arguing that the July 31, 1981, transaction involved intentionally fraudulent conveyances, plaintiff relies on the structure of the loan transaction between the Brogan group and Security Pacific and on the subsequent conduct of some of the defendants. Plaintiff argues that the defendants should be held liable under 39 Pa.Stat. § 357 and 11 U.S.C. § 548, because the evidence demonstrates that their actual intent was to hinder, delay, or defraud Jeannette's creditors. Plaintiff also argues that defendants should be liable under 39 Pa.Stat. § 356 because Jeannette intended or believed that it would incur obligations beyond its ability to pay. We explain below why we do not agree, and we set forth our reasons for finding that the transaction did not involve intentionally fraudulent conveyances.

Plaintiff also attacks the July 31, 1981, transaction under the constructive fraud sections of the applicable fraudulent conveyance acts, 39 Pa.Stat. §§ 354 and 355, and 11 U.S.C. § 548. While we find that the transaction was without fair consideration to Jeannette, we conclude that Jeannette was not rendered insolvent by it. Similarly, we conclude that Jeannette was not engaged in a business for which the capital remaining in its hands after the July 31, 1981, transaction was an unreasonably small capital. Because the fraudulent conveyance provisions of the Bankruptcy Code substantially mirror those of the Uniform Fraudulent Conveyance Act, we also

---

**1.** Plaintiff's claims for violation of the Racketeer Influenced and Corrupt Organizations Act (Count One), for breach of fiduciary duty (Counts Six and Seven), and for common law fraud (Count Nine) were severed and will be tried to a jury. Counts Four and Ten are no longer before us.

**2.** The bankruptcy case was converted to a voluntary one under Chapter 11 on December 10, 1982, with Jeannette Corporation operating as a debtor-in-possession. Subsequently, plaintiff was appointed trustee. This court converted the case to one under Chapter 7 by order dated May 1, 1990.

conclude that plaintiff has failed to establish that the transaction should be set aside under those provisions.

Finally, we conclude that plaintiff has failed to prove that an unlawful dividend and/or distribution of Jeannette's assets took place as a result of the July 31, 1981, transaction.

### Findings of Fact[3]

*Parties*

1. Plaintiff James Moody is the duly appointed trustee of the bankruptcy estate of Jeannette Corporation. (Jt. Stip., ¶ 1).

2. Defendant Security Pacific Business Credit Inc. is a corporation organized and existing under the laws of the State of Delaware, engaged in the business of commercial finance, having a principal place of business at 228 East 45th Street in the City of New York, State of New York. A.J. Armstrong Co., Inc., which was engaged in the same business, was acquired by Security Pacific during the last week of July 1981. (For the sake of convenience, A.J. Armstrong Co., Inc. will be referred to hereinafter as "Security Pacific" unless otherwise noted). (Jt. Stip., ¶ 2).

3. Defendant The Coca-Cola Bottling Company of New York, Inc. is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business in the Town of Greenwich, State of Connecticut. (Jt. Stip., ¶ 3).

4. Defendant KNY Development Corporation, which was also a Delaware corporation, was merged into Coke of New York and no longer exists as a corporate entity; it was a wholly-owned subsidiary of Coke of New York. (For convenience, Coke of New York and KNY Development will be referred to at times collectively as "Coke" or "Coke of New York"). (Jt. Stip., ¶ 4).

5. Defendant J. Corp. is a corporation incorporated under the laws of the State of Delaware on July 24, 1981. Defendant John P. Brogan ("Mr. Brogan" or "Brogan") has been the Chairman and a director of J. Corp., as well as of Jeannette Corporation, since July 1981. (Jt. Stip., ¶ 5).

6. Defendants Brogan, John J. Brogan, Brogan's father ("J.J. Brogan"), Hanley Dawson, Jr., Hanley Dawson III and James A. McLean became directors of Jeannette Corporation on or after July 31, 1981. Defendant James Winoker was a director of J. Corp. (D–259).[4]

7. Defendant Muench–Kreuzer Candle Company ("M–K Candle") is a corporation organized and existing under the laws of the State of Delaware. Brogan is also Chairman of the Board of M–K Candle. (Jt. Stip., ¶ 6).

*Jeannette Corporation: 1898–1978*

8. Jeannette Corporation is a Pennsylvania corporation headquartered in Jeannette, Pennsylvania which manufactured and sold, by itself or through subsidiaries, glass, ceramic, china, plastic and candle houseware products, principally in the United States and Canada. Jeannette's predecessor, the Jeannette Glass Company, was founded in 1898. (Jt. Stip., ¶ 7).

9. As of July 1981, there were four major components of Jeannette Corporation, which conducted different manufacturing operations at different locations. The Jeannette Glass division of Jeannette Corporation, located in Jeannette, Pennsylvania, manufactured glass products. The Brookpark division of Jeannette Corporation, located in Lake City, Pennsylvania, manufactured melamine dinnerware. The Royal China subsidiary of Jeannette Corporation, located in Ohio, manufactured earthenware, chinaware and ceramic products. The Old Harbor Candle subsidiary of Jeannette Corporation, located in Massachusetts, manufactured candles. (Joint Stip., ¶ 8).

---

**3.** The parties stipulated to many of the facts in this case and nearly all paragraphs of the Joint Stipulation were offered and received into evidence. When the court's finding is based upon the Joint Stipulation, we will cite the applicable paragraph, rather than the portion of the transcript showing the receipt of the stipulated fact in evidence.

**4.** We will reference exhibits by an abbreviation and a number. Stipulated exhibits will be identified by the letter "S," plaintiff's exhibits by "P," and defendants' by "D."

10. Jeannette's customers included chain, department, specialty and discount stores, market outlets, premium users, restaurant suppliers, and original equipment manufacturers such as lamp and appliance manufacturers. (Jt. Stip., ¶ 9).

11. In approximately 1960, Maurice L. Stonehill acquired a controlling interest in the Jeannette Glass Company, which subsequently became "Jeannette Corporation" in 1971. (Jt. Stip., ¶ 11).

12. During the years Mr. Stonehill controlled the company, Jeannette Glass/Jeannette Corporation made a number of acquisitions, including McKee Glass Works in 1961; Royal China Co. and the Brookpark facility in 1970; Old Harbor Candle Co. in 1975; and Walker China Co. in 1976.

13. During the mid–1970s, the officers of Jeannette Corporation included: Maurice L. Stonehill, Chairman; Mark B. Silverberg, President; Thomas S. Smith, Vice President—Manufacturing; Frank W. Storey, Vice President—Finance, Treasurer and Controller; and Calvin D. McCracken, Secretary.

14. For many years prior to 1979, Jeannette Corporation was a successful company. It and its subsidiaries experienced substantial growth and consistent profitability over those years. On a consolidated basis, annual net sales grew from approximately $9.6 million in 1965 to $61.7 million in 1978. Jeannette Corporation and its subsidiaries earned a net profit in each of those years, and in all of those years, except one, sales on a consolidated basis increased. (Jt. Stip., ¶¶ 12, 15).

15. On a consolidated basis, Jeannette's annual gross profit margin (net sales minus cost of goods sold) during 1965 through 1978 ranged from 18% to 32.9% of net sales. In all but two of those years it exceeded 20%. (Jt. Stip., ¶ 16).

16. During the three years ending December 31, 1977, Jeannette's sales, on a consolidated basis, had an average compound growth rate of 16% per year. (Jt. Stip., ¶ 17).

17. In the fiscal year ended December 31, 1977, Jeannette's consolidated financial records reflected net after-tax income of $3.4 million on sales of approximately $59 million. (Jt. Stip., ¶ 18).

18. Capital expenditures at Jeannette Corporation during 1977 included $2 million to build an electric glass-melting furnace which increased glass production capacity by 25%. The funds used to build the new electric furnace were borrowed from Mellon Bank, N.A., through the Westmoreland County Industrial Development Authority, at an interest rate of 6.34%. (Jt. Stip., ¶¶ 19–20).

19. In November 1977, Jeannette Corporation entered into a $6 million revolving credit arrangement with Mellon Bank. The proceeds of this arrangement were used to refinance short-term debt and otherwise augment working capital. (Jt. Stip., ¶ 21).

20. The consolidated pre-tax profit of Jeannette Corporation and its subsidiaries in 1978 was approximately $6.1 million, the highest ever achieved. (Jt. Stip., ¶¶ 22–23).

21. The testimony of a number of witnesses established that the business of Jeannette Corporation and its subsidiaries on a consolidated basis tended to be cyclical, with the second half of the year generally having higher sales and being more profitable than the first half. Jeannette Corporation's production, however, involved high fixed costs throughout the year. Its cash needs, therefore, varied substantially month to month. It needed access to cash from sources other than sales during the first half of the year in order to meet its expenses.

*Jeannette Corporation: 1978–1981*

22. In June of 1978, Coke of New York made a tender offer to acquire any and all outstanding shares of Jeannette Corporation stock for $20 per share, which the Jeannette board of directors accepted. (Jt. Stip., ¶ 24).

23. Coke of New York accomplished its acquisition of Jeannette Corporation through its wholly-owned subsidiary, KNY Development, and completed the acquisition by the end of 1978. Thereafter, Jeannette Corporation was operated as a whol-

ly-owned subsidiary of Coke of New York. (Jt. Stip., ¶ 25).

24. Coke of New York paid a total of approximately $39.6 million for the stock of Jeannette Corporation. This price was negotiated in an arms-length transaction between a willing buyer and a willing seller. (Jt. Stip., ¶ 26).

25. Coke of New York's acquisition of Jeannette Corporation was part of a diversification program it established because of concerns regarding its core bottling business. Prior to 1978, Coke of New York had acquired several other businesses as part of this program. (Jt. Stip., ¶¶ 27–28).

26. Charles E.F. Millard ("Mr. Millard") was the Chairman and Chief Executive Officer of Coke of New York from 1978 through 1981. (Jt. Stip., ¶ 29).

27. When Coke of New York purchased Jeannette Corporation, Mark Silverberg became Jeannette's Chief Executive Officer. Mr. Silverberg reported to William J. Sullivan, Executive Vice President of Coke of New York. Mr. Sullivan reported directly to Mr. Millard. (Jt. Stip., ¶¶ 30–32).

28. The May 1978 consolidated balance sheet of Jeannette Corporation and its subsidiaries reflected a net stockholders' equity of $23.5 million. Therefore, the $39.6 million purchase price exceeded the net book value of Jeannette Corporation by approximately $16 million. (Jt. Stip., ¶ 33).

29. Following the acquisition, Coke of New York adjusted some of Jeannette's asset and liability accounts to reflect their fair market value at the date of purchase, in accordance with Generally Accepted Accounting Principles ("GAAP"). (Jt. Stip., ¶ 34).

30. Coke of New York had a financial incentive to write-up the value of Jeannette's property, plant and equipment ("PP & E") to the maximum extent permitted because it paid approximately $16 million over book value. Had it not done so, then the entire $16 million excess would have been reflected as "goodwill." The amount of goodwill could be reduced to the extent that Coke of New York could justify moving it to the PP & E column where it became subject to depreciation.

31. To achieve this end, Coke of New York obtained an appraisal of Jeannette's PP & E. The appraisal report concluded that the fair market value of the PP & E of Jeannette Corporation and its subsidiaries was over $29 million, as of September 15, 1978. Of that amount, over $26 million related to PP & E that remained in Jeannette's possession as of July 31, 1981. (Jt. Stip., ¶¶ 35–36; D–169).

32. Based in part on the appraisal, Coke of New York increased the values assigned to some of the PP & E by approximately $5.7 million dollars on Jeannette Corporation's financial records, to an amount somewhat lower than the full appraised value. The total net book value for PP & E was approximately $22.4 million as of the end of 1978. (Jt. Stip., ¶ 36).

33. Over $11 million was allocated to goodwill on the Jeannette Corporation consolidated balance sheet, reflecting the cost to Coke of New York of the acquisition in excess of the value attributed to the assets and liabilities acquired. (Jt. Stip., ¶ 37).

34. Jeannette was not as financially successful in 1979, its first full year under Coke of New York's ownership, as it had been in prior years, particularly after giving effect to certain noncash adjustments and to costs associated with the acquisition. (Jt. Stip., ¶ 42; S–36, p. 7).

35. The consolidated pre-tax loss of Jeannette Corporation and its subsidiaries in 1979 was approximately $5 million. Approximately $2 million of that amount, however, was attributable to a new procedure adopted in that year for the valuation of inventory at the Jeannette Glass facility in order to satisfy the GAAP requirement that inventory be valued at the lower of cost or market. This adjustment did not involve any actual cash outlay. (Jt. Stip., ¶¶ 40–41; D–282, p. 1; S–29, pp. 4–6).

36. The consolidated net sales in 1979 were almost $4 million lower than they had been in 1978. This was only the second time since 1966 that annual net sales had declined from a prior year. (Jt. Stip., ¶ 43).

37. In June 1979, a special management task force of Coke of New York prepared a report analyzing the causes of Jeannette Corporation's disappointing 1979 performance. The task force found that the reasons for the large profit decline were complex and went to all aspects of Jeannette's business, and that the root causes of the problem were neither self-correcting nor short-term. Nevertheless, the report concluded that the problems could be corrected and that Jeannette could perform well in the future. (D–716).

38. Jeannette Corporation's financial performance improved in 1980 compared to 1979. Its net sales increased by over $9 million, and its gross margin as a percentage of net sales increased from 7.7% to 14.5%. It achieved approximately a break-even year prior to the recognition of Coke of New York's acquisition costs. (Jt. Stip., ¶¶ 67–68).

39. Jeannette Corporation's profit from operations in 1980 (before interest, miscellaneous expenses, taxes, and acquisition costs) was approximately $1.3 million. This figure would have been even higher but for the substantial expense resulting from depreciation. Mr. Pfingstler, Coke of New York's expert witness, testified that Jeannette had a positive cash flow in that break even year of approximately $3 million.

40. Jeannette Corporation's improved performance in 1980, compared to 1979, was due in large part to substantial increases in net sales by the Jeannette Glass division and by the Royal China subsidiary. (S–29, p. 5; S–36, pp. 7, 11–12).

41. In July 1981, immediately prior to the sale of Jeannette Corporation by Coke of New York to J. Corp., Jeannette Corporation was projecting that in 1981 it would have net sales of approximately $70 million and an operating income (before interest, taxes, and acquisition costs, but after depreciation) of $1,376,000. (S–2; S–33; D–891).

42. During the period 1978 through 1981, Coke of New York invested approximately $6 million in Jeannette for capital expenditures and approximately $5 million for maintenance and repairs to its physical plant.

*Coke of New York's Search for a Buyer*

43. In April 1979, corporate management at Coke of New York began evaluating all of its operations to determine which businesses it wished to continue to operate and which businesses it wished to divest. (Jt. Stip., ¶ 44).

44. Coke of New York ultimately decided to sell Jeannette Corporation as part of an overall corporate strategy designed to reverse the earlier diversification program and focus the company's attention and resources on its core bottling businesses. The decision occurred in the context of another strategic decision made in 1980, whereby Coke of New York ultimately was taken private in late 1981 in a leveraged buyout, valued at over $200 million. (Jt. Stip., ¶ 64).

45. In November 1979 Coke of New York retained Fulham & Co., Inc. ("Fulham & Co."), a private investment banking firm, to find prospective purchasers for Jeannette Corporation's Brookpark Division and its Old Harbor and Walker China subsidiaries. By December 1979, Fulham & Co. was asked to locate purchasers for all of Jeannette Corporation. (Jt. Stip., ¶¶ 46–47).

46. Fulham & Co. was authorized to develop qualified buyers and to conduct the preliminary steps in the acquisition of Jeannette Corporation by these buyers. By mid-April 1980, Fulham & Co. had contacted approximately 44 companies in connection with its effort to sell Jeannette Corporation. (Jt. Stip., ¶¶ 47–48; S–115).

47. In June 1980, Jeannette Corporation sold its Walker China subsidiary to Mayer China Company, pursuant to an agreement in principle reached during February 1980. (Jt. Stip., ¶¶ 49–50).

48. At its July 23, 1980, meeting, Coke of New York's board of directors ratified a recommendation to sell the stock of Jeannette Corporation, and determined that the value of Coke's investment in Jeannette should be written down, as of June 30, 1980, to approximately $17 million, a reduction of some $22.6 million from its previ-

ously carried book value. The write-down was made on the basis of negotiations in progress which indicated that Coke of New York would derive approximately $17 million from the sale of Jeannette, net of the costs associated with the sale. This write-down was in accordance with GAAP for reporting discontinued operations. (Jt. Stip., ¶¶ 54–57).

49. Also during the summer of 1980, the Coca–Cola Company based in Atlanta (hereafter "Coca–Cola") advised Mr. Millard of reports that a third party might be planning an unfriendly takeover of Coke of New York. (Jt. Stip., ¶ 62).

50. Throughout 1980, Fulham & Co. continued its efforts to locate a purchaser for Jeannette Corporation and/or its subsidiaries. (Jt. Stip., ¶ 66).

51. As part of these ongoing efforts, Fulham & Co. contacted a representative of Lancaster Colony Corporation ("Lancaster Colony"), on August 17, 1980, to discuss the interest Lancaster Colony might have in purchasing Jeannette Corporation. Lancaster Colony was a company engaged in the manufacture and sales of housewares. (Jt. Stip., ¶ 70).

52. Shortly thereafter, from late September through early November 1980, there were several discussions between management representatives of Coca–Cola and Coke of New York. Those discussions culminated in a tentative agreement on or about November 23, 1980, in which Coca–Cola agreed to purchase the stock of Coke of New York for $215.8 million, and then resell most of it to members of current management (including Mr. Millard) and other investors by means of a leveraged buyout. This leveraged buyout was consummated in August 1981, a month after the transaction at issue here. (Jt. Stip., ¶¶ 63–64).

53. Generally speaking, a leveraged buyout is a transaction in which a substantial part of the purchase price paid for the stock of a corporation is borrowed, and that borrowing is secured by the corporation's assets. A fundamental feature of leveraged buyouts generally is the substitution of debt for equity. The cash from the debt goes to the selling shareholders and the purchasers obtain the benefits of ownership.

54. On December 4, 1980, Coke of New York and Lancaster Colony jointly announced an agreement in principle for Lancaster Colony to acquire Jeannette Corporation from Coke of New York for cash and securities valued at approximately $19 million. (Jt. Stip., ¶ 71).

55. In late May 1981, Lancaster Colony informed Coke of New York that it was withdrawing its agreement to purchase the stock of Jeannette Corporation. While Coke of New York proposed a reduction in the sales price, the transaction never took place. (Jt. Stip., ¶ 72).

56. After Lancaster Colony withdrew its offer to purchase Jeannette Corporation, Fulham & Co. was recommissioned to search for prospective purchasers for Jeannette. (Jt. Stip., ¶ 73).

*Coke of New York's Negotiations with Brogan*

57. In June 1981, Mr. Brogan, who had known Mr. Fulham for many years, learned from Fulham & Co. that Coke of New York was attempting to sell Jeannette Corporation. Brogan previously had expressed an interest in purchasing Jeannette's Old Harbor subsidiary. (Jt. Stip., ¶¶ 73–75).

58. According to Brogan, his business involved acquiring companies through leveraged buyout transactions. M–K Candle, for example, was a company that he and his small group of regular investors had acquired through a leveraged buyout.

59. Fulham & Co. knew that Brogan's business centered on leveraged buyout transactions. It also knew that he was a successful businessman who had acquired and had profitably run companies through leveraged buyouts, although two of Brogan's companies had been involved in bankruptcy proceedings.

60. Through Fulham & Co., Coke of New York supplied financial data concerning Jeannette Corporation to Brogan and began to negotiate with him about a possible purchase of Jeannette. (Jt. Stip., ¶¶ 77, 78, 80, 81).

61. By mid-July 1981, Brogan had offered to acquire all of the stock of Jeannette Corporation for $11 million, along with a letter of credit in the amount of $1.5 million to assure payment of contingent pension liabilities. (Jt. Stip., ¶ 82).

62. According to Mr. Millard and Fred H. Marcusa, Coke of New York's Vice President and General Counsel, the price that would be paid to shareholders in the leveraged buyout of Coke of New York had been established by mid–1981. Therefore, the purchase price for Jeannette would have no impact on Coke of New York shareholders. Having lost half a year or more on the unsuccessful Lancaster Colony transaction, and with most of company management's attention being devoted to Coke of New York's own "going private" leveraged buyout transaction, Coke of New York was willing to reduce the selling price of Jeannette Corporation below the Lancaster Colony price. Coke of New York wanted a buyer who would be able to close the transaction expeditiously and allow it to move forward with its plans to be a privately held company focused on the bottling business.

63. During a meeting at the offices of his attorney, Brogan suggested that the transaction include a stock redemption. Brogan and Mr. Heberling, an in-house attorney for Coke of New York, testified that Brogan's proposal called for Coke of New York to cause Jeannette to encumber its assets to raise funds which would be paid to Coke to redeem (i.e., buy back from Coke) a portion of Jeannette's stock. Brogan would then buy the remaining Jeannette stock for the difference between the purchase price and the amount of the new encumbrance placed on Jeannette's assets.

64. Mr. Marcusa rejected Brogan's redemption proposal for several reasons, including Mr. Marcusa's judgment that the proposal was inappropriate and would involve complicated legal issues. Mr. Marcusa also believed that the deal should be relatively straightforward in light of the low purchase price.

65. On or about July 22, 1981, Brogan agreed to increase his offer for the stock of Jeannette Corporation from $11 million to $12 million, and Coke of New York dropped the requirement that Brogan provide it with a letter of credit as security for the potential unfunded pension liability. (Jt. Stip., ¶ 84).

66. As a condition for the elimination of the letter of credit, the Purchase Agreement between Coke of New York and J. Corp. provided that the Jeannette Union Pension Plan would not be terminated within sixty calendar months of the closing, and that the purchaser, J. Corp., would undertake to indemnify Coke of New York for any liability which would result from termination and/or derogation of the provisions of the Purchase Agreement. (Jt. Stip., ¶ 85).

67. As a further condition to the elimination of the letter of credit, Brogan agreed to provide to Coke of New York a security agreement and security interests in the assets of Jeannette Corporation to the extent that Coke of New York should be called upon to pay any unfunded vested pension liability. (Jt. Stip., ¶ 86).

68. The $12.1 million price at which the stock of Jeannette Corporation was ultimately sold on July 31, 1981, was not derived by evaluating individual or specific assets of Jeannette; rather, it was determined as a result of overall arm's length negotiations.

69. Both Brogan and Mr. Millard understood that Coke of New York's agreement to sell Jeannette Corporation for $12.1 million was conditioned on Brogan's completing the transaction by the end of July. If he did not do so, Coke of New York could change the price or "shop" the company to other prospective buyers. Coke of New York and Brogan reasonably viewed this price as a significant bargain for Brogan, made possible by Coke of New York's desire to return to its core businesses and Brogan's contemplated ability to close the transaction quickly.

70. In July 1981, Coke of New York wrote down its investment in Jeannette Corporation to approximately $9.1 million. This figure represented what Coke of New York had determined to be the anticipated

net realizable value to Coke of Jeannette at that time, including estimated costs of disposition and a reserve for losses through the expected date of sale, in accordance with GAAP. (Jt. Stip., ¶ 76).

*Brogan's Efforts to Obtain Financing*

71. Brogan approached New England Merchants Bank about the possibility of providing acquisition and working capital financing for Jeannette Corporation. New England Merchants Bank prepared a 55–page report that analyzed the accounts receivable and inventory of Jeannette Corporation and its subsidiaries. (Jt. Stip., ¶ 87).

72. By mid-July, Brogan realized that New England Merchants Bank would not be able to make a decision regarding the financing quickly enough. He contacted Joseph Realmuto, a Vice President of A.J. Armstrong Co., Inc. (which shortly thereafter became Security Pacific), about financing a transaction by the end of the month. (Jt. Stip., ¶ 88).

73. A.J. Armstrong had been in the business of providing secured financing, including leveraged acquisition financing, for many years. Its personnel had substantial experience in determining whether a business was a good candidate for a leveraged acquisition. (Jt. Stip., ¶ 89).

74. Because A.J. Armstrong was a small, informally run organization with substantial asset-based lending experience it could analyze and make a decision regarding a proposed transaction more rapidly than many other lending institutions.

75. Security Pacific (we will hereinafter refer to A.J. Armstrong and/or Security Pacific as "Security Pacific") was familiar with Mr. Brogan, having previously supplied the acquisition and ongoing working capital financing of M–K Candle. Its personnel had a high opinion of Brogan's business abilities, particularly his ability to run a business that had been acquired through a leveraged buyout. (Jt. Stip., ¶ 90).

76. Mr. Realmuto, during his prior employment with another commercial finance organization, had been the account executive involved in the financing of two companies which Brogan and his father had acquired Ingram Richardson Company and Road Machinery, Inc. (Jt. Stip., ¶ 91).

77. Ingram Richardson Company and Road Machinery, Inc., both of which had been acquired by means of leveraged transactions, were subsequently forced into Chapter 7 bankruptcies. Mr. Seiden, the Senior Vice–President at Security Pacific in charge of new business, was aware from discussions with Mr. Realmuto prior to July 31, 1981, that both companies had some difficulties. Nevertheless, Security Pacific had a high opinion of Brogan's ability to run a leveraged company in light of the M–K Candle relationship.

78. A day or two after the initial telephone call between Brogan and Mr. Realmuto, Brogan met with Security Pacific personnel in their New York offices to discuss possible financing. Brogan and Security Pacific understood that any such financing would be secured by a pledge of Jeannette Corporation's assets. This meeting took place on or after July 15, 1981. (Jt. Stip., ¶ 92).

79. In analyzing Jeannette, Brogan prepared one year of monthly projections of (a) Jeannette's balance sheet, (b) its income statement, and (c) the resulting anticipated revolving credit availability. These projections showed that availability remained positive by a comfortable margin throughout the entire year. Brogan provided these projections to Security Pacific, which reviewed them and concluded that they were reasonable. In fact, Security Pacific personnel considered the proposed Jeannette financing to be in the top ten percent of the deals they had done in this area. (Tr. 11, 93:8–94:24 (Brogan); Tr. 14, 127:20–130:25, 163:9–163:21 (Seiden)).[5]

*Security Pacific's Decision to Finance the Transaction*

80. Stephen Ngan performed part of Security Pacific's review of the proposed Jeannette Corporation financing. Mr. Ngan was a credit analyst who held an MBA

---

5. Our citations to the transcript of the trial will be in the form "Tr. [volume], [page]:[line]." When applicable, we will identify the witness following the transcript citation.

from New York University and who had years of prior experience at several lending institutions, including Chemical Bank and Chase Manhattan Bank. Mr. Ngan later left Security Pacific to acquire the Walkin Shoe Company through a leveraged buyout.

81. When Brogan originally spoke to Security Pacific about the transaction, he proposed that he and his investment group would invest a total of $400,000: $200,000 in stock, and $200,000 in subordinated debt. Security Pacific advised Brogan that it wanted to see more commitment on the investors' part, and suggested an equity investment of ten percent of the total purchase price, approximately $1.2 million. In lieu of this additional equity, Brogan offered to give Security Pacific a guaranty from M–K Candle, a profitable company owned by the J. Corp. investors.

82. Security Pacific accepted Mr. Brogan's proposal as it considered the M–K Candle guaranty to be very valuable because M–K Candle was a successful company. (Tr. Vol. 14, 138:20—140:14 (Seiden)).

83. During the last week of July 1981, Security Pacific sent Mr. Ngan and Metro Jones, a field examiner, to Jeannette Corporation's headquarters to review the company's financial records and to speak with company personnel. They had with them a copy of the New England Merchants report, which Brogan had given to Security Pacific, and were able to rely in part upon that prior work. Mr. Ngan spoke with Jeannette Corporation President Mark Silverberg and company financial personnel and relied upon information they provided to him. Mr. Ngan's analysis included a discussion with Frank Storey and other accounting personnel concerning Jeannette's working capital needs, going back through the company's prior performance on a month-by-month basis for an 18 month period. (Jt. Stip., ¶¶ 93–94; Tr. 5, 143:11–143:17 (McCracken); Tr. 17, 127:6, 140:18–141:22, 159:2–159:14, 170:2–170:11, 173:7–173:21, 185:19–186:3, 195:11–195:13 (Ngan); Tr. 20, 10:16–11:10).

84. While Mr. Ngan advised Jeannette Corporation personnel that his analysis was for the possible financing of Brogan's transaction, he did not advise them of the structure of the proposed transaction.

85. Mr. Ngan worked with a sense of urgency because Security Pacific had little time to decide whether to finance Brogan's purchase of Jeannette.

86. Based upon the financial information and projections Mr. Ngan obtained from Jeannette Corporation, he prepared a memorandum dated July 28, 1981, in which he discussed Jeannette Corporation's financial condition and analyzed the possible effects of the proposed acquisition financing on the company. (Jt. Stip., ¶ 95; S–29).

87. The parties disputed the impact of Mr. Ngan's memo, as well as the soundness of its assumptions and conclusions. Mr. Ngan concluded that after the proposed acquisition, Jeannette Corporation would have a "very respectable" tangible net worth of at least $9 million and would earn a pre-tax profit of $800,000 in its first year of operation after the acquisition, even after the payment of interest on the acquisition debt. That pre-tax profit figure also took into account depreciation expense calculated on the basis of Coke of New York's upwardly revised valuation of fixed assets. (S–29, pp. 1, 8, 12).

88. Mr. Ngan's profit figure was based partly on a projected sales figure of $75 million. Jeannette President Mark Silverberg, who described expected price increases and new product lines, supplied Mr. Ngan with that figure. Mr. Ngan concluded that Mr. Silverberg's sales projection was reasonable based on the company's prior experience and other available information. While plaintiff attacks the $75 million dollar figure as overly optimistic, it was Jeannette's own president who gave this figure to Mr. Ngan. Furthermore, while somewhat less probative than the judgment of the company's president, Jeannette Corporation's 1980 business plan projected 1982 sales of over $90 million at a gross margin of 18.7%. (S–32, p. 6325).

89. Based on discussions with and information from Jeannette Corporation management personnel, Mr. Ngan's memo used a 17% gross profit margin assump-

tion. Jeannette Corporation's gross profit margin had exceeded that figure in every year between 1965 and 1978. In 1979 it had dipped to 7.7%, and in 1980 it was 14.5%. Because several of Jeannette Corporation's operations were high fixed cost operations, an increase in the gross margin percentage would have been consistent with an increase in sales.

90. In his memo, Mr. Ngan compared Mr. Brogan's projection for the first year of operation with Jeannette Corporation's actual 1980 performance and Jeannette's projection for 1981. He found the Jeannette 1981 projection to be realistic when viewed in reference to the actual results achieved in 1980 and in the first six months of 1981. Mr. Ngan concluded, however, that the Brogan projection was not realistic because it had an overly optimistic gross profit margin of 16.9% forecast on a sales volume of $70 million. Plaintiff faults Mr. Ngan for then using sales and gross profit figures higher than those used by Mr. Brogan. As we found above, however, the sales figure was reasonable under the circumstances. At any rate, Brogan's figures are not as overly optimistic as Mr. Ngan first believed. As Brogan explained to Mr. Seiden, the Brogan projection figures took into account the substantial reduction in annual depreciation expense which would result from Brogan's anticipated write down of the book value of Jeannette's fixed assets. Using the anticipated lower depreciation levels, Brogan's projection of a $930,000 operating profit based upon $70 million in sales was consistent with Jeannette's actual and projected sales and operating experience in 1981. On the other hand, Mr. Ngan's calculation had been based on depreciation levels as recorded under Coke of New York's ownership.

91. The earnings projection reflected in Mr. Ngan's memo included depreciation that was calculated on the basis of the PP & E values carried on Jeannette's books under Coke of New York. Using that accounting basis, the company could have sustained apparent paper losses amounting to millions of dollars annually and still have been able to continue paying its debts and to operate normally because of its cash flow. (Tr. 14, 144:15–145:7 (Seiden); D–891; D–892; Tr. 18, 168:22–170:13 (Pfingstler)).

92. Based upon his analysis, Mr. Ngan recommended that Security Pacific agree to provide financing for the acquisition of Jeannette Corporation and for subsequent working capital. Mr. Ngan thought that Jeannette would be very successful after the proposed transaction. (Jt. Stip., ¶ 96; S–29, p. 12).

93. Security Pacific also sent one of its employees, E.J. Donegan, to the Jeannette Glass facility to conduct an inventory inspection. Mr. Donegan prepared a July 24 memorandum in which he described the nature and condition of the Jeannette Glass inventory and made recommendations regarding how much Security Pacific might consider lending against that inventory as collateral. (S–124).

94. After senior Security Pacific personnel had reviewed various materials including Jeannette's financial records, Mr. Ngan's July 28, 1981, memorandum, Mr. Donegan's July 24, 1981, memorandum, the Manufacturers' Appraisal report, the New England Merchants report, and Mr. Brogan's projections, they concluded that the proposed transaction would leave Jeannette Corporation with a substantial margin of solvency and more than adequate capital to continue operating its businesses, including millions of dollars of working capital financing from Security Pacific. (Tr. 14, 150:6–153:8, 155:6–155:18, 159:4–164:16 (Seiden)).

95. As was its practice in all proposed leveraged buyout transactions, before entering into the Jeannette revolving credit transaction, Security Pacific furnished its entire file on Jeannette to its counsel. Based upon this information, counsel agreed with Security Pacific's conclusion that the transaction would not violate the fraudulent conveyance laws, in light of Jeannette's substantial net worth and capitalization after the proposed transaction. Security Pacific, however, did not ask for an opinion letter from counsel to this effect.

(P–166; Tr. 14, 169:25–172:11; Tr. 15, 71:5–71:8, 72:10–72:15 (Seiden)).

96. Security Pacific decided to proceed with the proposed financing of the acquisition of Jeannette Corporation in the last few days of July 1981, after Mr. Ngan's July 28, 1981, report had been submitted and reviewed by other Security Pacific personnel. (Jt. Stip., ¶ 97).

97. Security Pacific officials testified, and we accept their testimony as true, that Security Pacific had no incentive to make this loan if it believed that Jeannette would fail. Security Pacific made its money by earning interest in continuing, long-term lending relationships, and it received no up-front fees relating to this transaction. It also knew from prior experience that failure of a leveraged company could result in a fraudulent conveyance claim and that even the successful defense of such a case would be costly and time consuming. (Tr. 14, 123:19–124:14, 164:20–166:13 (Seiden); Tr. 16, 82:23–83:20 (Faraone)).

98. Security Pacific would not have entered into this lending arrangement if it did not believe that Jeannette would be successful. (Tr. 14, 165:11–166:9 (Seiden)).

██ 99. In agreeing to provide the financing of J. Corp.'s acquisition of Jeannette Corporation, Security Pacific acted without fraudulent intent. Security Pacific had no ulterior motive in agreeing to provide the financing. Its only motive was its intention to profit from an ongoing lending relationship with the company. Based upon its investigation of the proposed transaction and its substantial experience with similar kinds of transactions, Security Pacific expected that Jeannette Corporation would operate profitably after such an acquisition. We find that its expectation was reasonable. (Tr. 14, 154:23–155:18, 159:4–161:2, 163:9–21, 174:11–179:14 (Seiden); Tr. 8, 133:2–133:23 (Faraone)).

*The July 31, 1981, Transaction*

*Pre-closing activities*

100. On July 24, 1981, J. Corp. was incorporated under the laws of the State of Delaware. J. Corp.'s originally-contemplated capitalization was $200,000 of subordinated debt, to be borrowed from M–K Candle, and $200,000 of equity. (Jt. Stip., ¶ 5).

101. As of July 31, 1981, J. Corp.'s $200,000 equity capitalization consisted of funds borrowed by J. Corp./John P. Brogan one day earlier from Lincoln Trust Bank in Hingham, Massachusetts. The Brogan group made their equity contributions shortly afterwards.

102. On July 29, 1981, Coke of New York's Board of Directors met in Hackensack, New Jersey to approve the sale of Jeannette Corporation to J. Corp. for the purchase price of $12 million, subject to adjustments at closing. (Jt. Stip., ¶ 98).

*The closing*

103. The closing of the sale of the stock of Jeannette Corporation to J. Corp. took place at the offices of Coke of New York in Hackensack, New Jersey on July 31, 1981. A pre-closing took place the day before in New York City. (Jt. Stip., ¶¶ 102–104).

104. Representatives of all the parties to the transaction attended the closing: the buyer, J. Corp., was represented by Mr. Brogan, James A. McLean and three attorneys from Thompson, Hine & Flory; the seller, Coke of New York, was represented by Mr. Sullivan (its Executive Vice President, and the management employee at Coke primarily responsible for overseeing the sale of Jeannette), Mr. Heberling, and at least two outside attorneys from the firm of Jones, Day, Reavis & Pogue; and the lender, Security Pacific, was represented by Mr. Seiden and other Security Pacific personnel, as well as by attorneys from the law firm of Kaye Scholer Fierman Hays & Handler. (Jt. Stip., ¶ 105).

105. At the July 31, 1981, closing, a series of transactions—which were deemed by agreement of the parties to have taken place simultaneously—were consummated, including the following:

(a) J. Corp. entered into an agreement with Coke of New York and KNY Development to purchase all of the outstanding stock of Jeannette Corporation from KNY Development.

(b) J. Corp. obtained an unsecured loan from Security Pacific in the amount of $12,110,800, executing a demand note in that amount to evidence the indebtedness.

(c) J. Corp. utilized the proceeds of the $12,110,800 loan to purchase the Jeannette Corporation stock from KNY Development, by authorizing and directing Security Pacific to disburse those proceeds to the order of Coke of New York.

(d) After J. Corp. acquired the stock of the Jeannette Corporation, it appointed a new board of directors for Jeannette Corporation, the Chairman and Vice–Chairman of which were Mr. Brogan and his father (John J. Brogan) respectively. The directors elected under Coke of New York's ownership previously had resigned.

(e) Jeannette Corporation, through Mr. Brogan, entered into an Accounts Receivable Security Agreement and related documents with Security Pacific under which it could obtain revolving credit.

(f) As security for this revolving credit facility, Jeannette Corporation executed security agreements granting Security Pacific first lien security interests in all of Jeannette's accounts receivable, inventory, equipment, and other personal property, as well as a mortgage on its real property. The security interests were perfected by Security Pacific's filing financing statements in various jurisdictions.

(g) Mr. Brogan, on behalf of Jeannette Corporation, executed a letter authorizing and directing Security Pacific to remit the proceeds of the first advance under the revolving credit facility, $11,710,800, to or for the account of J. Corp. These funds were used by J. Corp. to repay all but $400,000 of J. Corp.'s demand promissory note to Security Pacific.

(h) J. Corp. repaid the $400,000 balance of its indebtedness to Security Pacific.

(i) J. Corp. and M–K Candle executed guarantees to Security Pacific covering payment of certain obligations of Jeannette Corporation and its subsidiaries to Security Pacific.

(j) Jeannette Corporation, through Mr. Brogan, entered into an Agreement Re: Pensions under which it agreed to indemnify Coke of New York and KNY Development against potential liabilities (for employee pension benefits) which could arise upon the termination of certain Jeannette pension plans.

(k) As security for this indemnification, Jeannette Corporation (through Mr. Brogan) entered into an agreement granting Coke of New York and KNY Development a security interest in all of Jeannette's accounts receivable, inventory, equipment, and other personal property, which was subordinate to the security interest held by Security Pacific.

(l) Coke of New York, KNY Development and Security Pacific entered into an Intercreditor Agreement in which they agreed among themselves that Security Pacific's secured claim had priority over any claim of Coke of New York with respect to Jeannette Corporation's assets.

(m) Jeannette Corporation and Security Pacific executed a Lock Box Agreement under which Jeannette Corporation undertook to instruct all customers to mail their payments to a post office box maintained by Mellon Bank, from which those payments would be transferred directly to Security Pacific and credited against the outstanding balance of Jeannette's revolving credit facility.

(Jt. Stip., ¶ 106).

106. At no time on or after July 31, 1981, did J. Corp. execute or deliver to Jeannette Corporation a promissory note or other document evidencing any indebtedness arising out of the initial $11,710,800 advance. J. Corp. has never repaid to Jeannette any portion of that advance.

107. The July 31, 1981, transaction was, and will be viewed by the court as, one integrated transaction. All parties were aware of the leveraged nature of the transaction, that Security Pacific would be providing the bulk of the funds for the transaction, that those funds would pass to J. Corp. and immediately to Coke of New York, and that Jeannette Corporation would repay the loan. Each portion of the July 31, 1981, transaction was dependent upon the occurrence of the other. The parties would not have completed any step of the transaction unless they all were completed.

108. We also find that Jeannette's grant of the security interest in its assets to secure the repayment of the initial $11.7 million advance was without fair consideration to Jeannette Corporation. The funds were actually for the benefit of J. Corp., which thereby acquired ownership of Jeannette. Jeannette's only benefit from the transaction was new management and access to the balance of the availability under the revolving credit facility discussed below. These were not fair consideration for the requirement to repay $11.7 million.

109. At the time of the July 31, 1981, transaction, Jeannette Corporation had outstanding an unsecured obligation to Mellon Bank, N.A., a portion of which remains unpaid, as well as outstanding trade debt. (Jt. Stip., ¶ 108).

110. Security Pacific was aware, in advance, of the structure and details of the July 31, 1981, transaction. In fact, Security Pacific's counsel either prepared or were intimately involved in the preparation of the loan documents signed at the closing.

■ 111. Coke of New York has maintained that it did not know, and was not particularly concerned with, the structure of Mr. Brogan's financing agreement with Security Pacific. However, it is clear from the facts adduced at trial that at the time of the July 31, 1981, closing, Coke of New York knew that J. Corp.'s acquisition of Jeannette Corporation was a leveraged buyout which would result in Jeannette Corporation's having a secured debt to Security Pacific in an amount somewhat below the $12.1 million purchase price. Coke of New York had rejected Brogan's stock redemption proposal, which clearly demonstrated Brogan's intent to leverage the transaction. Furthermore, Mr. Brogan told Coke of New York officials that he intended to encumber Jeannette's assets and ultimately Coke and Security Pacific entered into an Intercreditor Agreement regarding their security interests in Jeannette's assets. Finally, Coke of New York officials were present at the closing and pre-closing. In light of all this evidence, we find that Coke of New York knew that the transaction would be leveraged for a substantial part of the purchase price at the time of the closing.

*The Parties' Intent*

112. While we find that all of the parties were aware of the leveraged nature of the transaction, there is no evidence that before or after the July 31, 1981, transaction, Jeannette or any of the defendants ever intended to hinder, delay or defraud creditors, or believed that Jeannette would incur debts beyond its ability to pay as they matured. Projections prepared both before and after July 31, 1981, showed that the company could pay its debts and run its business in an ordinary manner. Those projections were reasonable and prudent at the time they were made. Based on these projections, those made by Mr. Brogan relating to availability, and the due diligence performed by Security Pacific, the parties involved all intended and believed Jeannette could pay its debts as they matured. We also find that no party to the July 31, 1981, transaction had an incentive to enter into that transaction if it had expected Jeannette to be unsuccessful. (S-29; S-33; S-34; S-44; S-45).

*Operation of the Revolving Credit Facility*

113. After the July 31, 1981, transaction Jeannette Corporation's asset base, on which it previously had been able to borrow, was fully liened. As a result of these liens, Jeannette Corporation could not dispose of any of its assets (except in the ordinary course of business) without the

prior consent of Security Pacific and Coke of New York; and if any such assets were sold, the proceeds were not available to Jeannette to spend as it saw fit. Rather, the proceeds of the sale of any of Jeannette's assets were applied to reduce the Security Pacific indebtedness.

114. In addition, Jeannette was prohibited under the terms of the loan documents from granting additional security interests to anyone else. This effectively eliminated Jeannette's access to required capital from any sources other than Security Pacific.

115. Under the loan documents, the proceeds of substantially all of Jeannette Corporation's accounts receivable after July 31, 1981, were paid directly into a lock-box account at Mellon Bank and applied to reduce Jeannette's $11.7 million secured obligation to Security Pacific. (Jt. Stip., ¶ 115).

116. As a result of the revolving credit facility, Jeannette Corporation's sole source of operating capital—i.e., funds required to run the business and to meet its seasonal working capital needs—was the remaining borrowing "availability" from Security Pacific. Jeannette had to borrow from Security Pacific on a daily basis the money it needed to carry on its business.

117. In general terms under the revolving credit facility, by applying preset lending formulas (i.e., 80% of accounts receivable, 50% of certain kinds of inventory, etc.) to the current balances of eligible collateral in these categories, and subtracting the outstanding loan balances, Jeannette and Security Pacific would determine Jeannette Corporation's net unused "availability"— the additional amount that it could, under normal circumstances, expect to borrow from Security Pacific under the revolving credit facility at any particular time. The formulas were designed to ensure that Jeannette did not borrow more money than it could repay under any circumstance, including a liquidation.

118. As payments from Jeannette Corporation customers came to Security Pacific through the lock-box, they were applied to reduce the outstanding loan balance, leading to an increase in availability. Jeannette would then draw upon this availability for funds to finance its further operations, which would eventually result in further customer payments into the lock-box. This cycle explains the characterization of this arrangement as a "revolving" credit facility.

119. The use of such a revolving credit facility, with customer payments directly to the lender through a lock-box and availability calculations based on collateral values, is a standard practice in the commercial finance industry.

120. The use of a lock-box speeds up the crediting of payments to a borrower's account (thus reducing interest expense and increasing availability) and protects a lender against misuse of its cash collateral.

121. Although the total outstanding Security Pacific loan balance on Jeannette Corporation's financial records never exceeded the initial $11,710,800 advance, because of the revolving nature of the credit facility, the total amount of cash advanced to Jeannette Corporation was many times that amount. (S–25; D–349; D–373).

122. The interest rate on the Security Pacific revolving credit was set at 3¼ percent over the prime rate. This was a standard, competitive rate at that time. The advances under the revolving credit facility were payable on demand, although the parties contemplated a long-term lending relationship. (Tr. 14, 166:14–167:18 (Seiden)).

123. Mr. Brogan had planned to spend approximately two weeks every month at Jeannette at the outset to ensure its successful operation under his ownership. Very shortly after the July 31, 1981, transaction, however, Brogan learned that his kidneys were failing. From August through November of that year his weakened physical condition limited his ability to devote attention to his businesses. In late 1981 he began dialysis treatments, which required him to be in the hospital three days a week and which seriously restricted out of town travel. In June 1982 he received a transplanted kidney from his sister, and under doctor's orders was able to devote virtually no attention to business matters from late May until September 1982.

124. Security Pacific had considered Brogan's active involvement in the transaction an important factor in its financing decision, because it respected his demonstrated ability to acquire and run businesses in leveraged transactions. Security Pacific may not have made the loan if it had known that Brogan had an illness that would seriously impede such involvement.

*Solvency of Jeannette Corporation*

125. It is undisputed that Jeannette Corporation was solvent before the July 31, 1981, transaction.

126. Immediately prior to the closing of the July 31, 1981, transaction, the consolidated financial records of Jeannette Corporation and its subsidiaries (which, with the exception of the Alternate Standard Reserve on inventory, were maintained in accordance with GAAP) reflected the following amounts for the company's balance sheet accounts (all figures, including totals, are rounded to the nearest thousand):

| Assets | |
|---|---|
| Cash | $   265,000 |
| Net accounts receivable | 7,929,000 |
| Inventory | 14,370,000 |
| Intercompany accounts | 519,000 |
| Other current assets | 46,000 |
| Total current assets | $23,129,000 |
| | |
| Property, plant & equipment | 17,731,000 |
| Goodwill | 11,377,000 |
| Other assets | 119,000 |
| Total assets | $52,356,000 |
| | |
| Liabilities | |
| Accounts payable | $ 2,964,000 |
| Current portion, long-term debt | 500,000 |
| Accrued liabilities | 4,168,000 |
| Current liabilities | $ 7,632,000 |
| | |
| Long-term debt | 1,856,000 |
| Accrued pensions | 2,441,000 |
| Total liabilities | $11,929,000 |
| | |
| NET WORTH | $40,427,000 |

(Jt. Stip., ¶ 107).

127. In the period following the July 31, 1981, transaction, each of Jeannette's four major operating segments continued to function as a going concern. The company continued collecting accounts receivable, producing and selling inventory, and paying its debts. Therefore, in valuing the company's assets, we use going concern values. (Tr. 18, 3:6–3:13 (Pfingstler)).

128. The $265,000 of cash remained with the company after closing and was used by it. Its present fair salable value as of July 31, 1981, was $265,000.

129. Under GAAP, a company must carry accounts receivable on its financial records at their net realizable value. Jeannette personnel calculated the $7.929 million of net accounts receivable by deducting over $1 million of reserves from total receivables. The reserves were designed to estimate the extent to which customers would fail to pay their accounts or would return goods or claim credits for breakage and similar problems.

130. Jeannette actually collected at least $8.3 million on the accounts receivable

that were outstanding at July 31, 1981. Over $7 million of this amount was collected by October 31, 1981.

■ 131. Based on the foregoing, we conclude that the present fair salable value of the receivables after the July 31, 1981, transaction was approximately $8.3 million.

132. In the July 31, 1981, transaction, Coke of New York had agreed to reimburse Jeannette Corporation for a portion of its pension obligation. The present fair salable value of that receivable as of July 31, 1981, was $248,000, which was the amount Coke of New York later paid to Jeannette.

133. GAAP required that Jeannette's inventory be valued at its cost or market value, whichever was lower. In 1979 Jeannette had established a reserve, known as the Alternate Standard Reserve, to effectuate this requirement for the Jeannette Glass inventory. In July 1981, the Alternate Standard Reserve was carried on the financial records of Coke of New York rather than those of Jeannette Corporation, and amounted to approximately $2.2 million. (Jt. Stip., ¶ 107).

134. Jeannette regularly monitored its inventory and either wrote off or wrote down inventory that was obsolete or slow moving. As of July 31, 1981, Jeannette's financial records did not reflect significant amounts of obsolete, slow moving, or overvalued inventory. (Tr. 5, 128:2–128:8 (McCracken)).

135. In the months following the July 31, 1981, transaction, the inventories of Jeannette Corporation and its subsidiaries turned over rapidly. Within a few months, most of the finished goods inventory (approximately $6 million of a total of $8 million) was sold, and most of the raw material and work in process was converted into finished product that was thereafter sold, generally at prices well above cost.

■ 136. The present fair salable value of Jeannette's inventory following the July 31, 1981, transaction was approximately $12.2 million using either the Alternate Standard Reserve carried on Coke of New

York's financial records or an analysis of the extent to which inventory may not have been sold or used profitably in the period following July 31, 1981.

137. The intercompany account between Jeannette Corporation and Coke of New York was canceled in the course of the July 31, 1981, transaction. Consequently, after the closing it had no value.

138. The prepaid amounts and other items represented by "other current assets" on the July 31, 1981, balance sheet of the company represented assets, such as prepaid rent, that were actually used thereafter by Jeannette Corporation or its subsidiaries in their subsequent operations. The present fair salable value of those other assets following the July 31, 1981, transactions was $46,000.

139. Based on the foregoing, the total present fair salable value of Jeannette Corporation's current assets (which excludes, among other things, PP & E) following the July 31, 1981, transaction was over $21 million. There was relatively little dispute at trial regarding the values of these assets.

■ 140. The parties sharply disagreed, however, on the value of Jeannette's PP & E. Coke of New York's expert witness, Mr. Pfingstler, opined that Jeannette's PP & E had a value of some $12.2 million. Plaintiff's expert did not give an opinion on the value of the PP & E. Rather, plaintiff argued that we should assign the PP & E no value in our solvency analysis. We discuss below our reasons for rejecting plaintiff's argument that these assets had no value. For the reasons which immediately follow, we find that Jeannette's PP & E was worth at least $5–6 million, and was possibly worth as much as Mr. Pfingstler's $12 million figure.

141. As of July 31, 1981, Jeannette carried its PP & E on its books and records at book value of $17,731,000, which was net of depreciation already taken.

142. In late 1978 and early 1979, the Manufacturers' Appraisal Company performed a fair market valuation of Jeannette's PP & E. For assets that remained

with Jeannette as of July 31, 1981, (Walker China had been sold in 1980), the fair market value appraisal indicated a value of $26,865,000 for PP & E. (D–169; D–864).

143. During the three years that Coke of New York owned Jeannette Corporation, over $11 million was spent on capital improvements and on maintenance and repair of fixed assets. The only major disposition of fixed assets during that period was in connection with the sale of the Walker China subsidiary. (D–866).

144. Mr. Pfingstler opined that the PP & E should be valued at approximately $12.7 million, rather than at the net book value of over $17 million. In doing so, he relied, in part, on work papers prepared in connection with the audit of the financial statements of Jeannette Corporation and its subsidiaries by the accounting firm Price Waterhouse in 1982. Those work papers led Mr. Pfingstler to conclude that some fixed assets were identified by Jeannette personnel as possibly having no continuing use as of July 31, 1981.

145. The work papers revealed that Price Waterhouse personnel concluded that $700,000 worth of the fixed assets identified by company personnel as worthless should be written off and that the value of the remaining PP & E on the financial statements as of July 31, 1981, should be reduced by the amount of the unamortized appraisal increment. The Price Waterhouse personnel therefore proposed that the PP & E be valued at $12,736,000 in accordance with GAAP as of July 31, 1981. Mr. Pfingstler relied upon these conclusions in assigning the PP & E a value of $12.7 million.

146. In July 1982, the inventory and fixed assets of the Old Harbor subsidiary were sold as a going concern by Jeannette Corporation to Towle Manufacturing Company for approximately $2 million. An audited financial statement prepared by Price Waterhouse in conjunction with that sale assigned a GAAP value of $2.5 million to those assets at the time, with approximately $1.3 million of that amount representing PP & E, less accumulated depreciation. (Jt. Stip., ¶ 118; D–141; P–367, pp. 1–10).

147. In November 1982, Jeannette Corporation sold the assets of its Brookpark division (other than cash and receivables) as a going concern for $1.1 million cash and notes and the assumption of $62,000 of accrued liabilities. (Jt. Stip., ¶ 120).

148. In the Brookpark sale, $550,000 of the purchase price was attributed by the parties to the division's real property (land and buildings), according to the realty transfer tax affidavit of value. (D–353A).

149. In 1983, Jeannette Corporation's Royal China subsidiary was placed in a bankruptcy proceeding. In 1984 the operating assets of the company were sold as a going concern out of bankruptcy for a net amount of approximately $4.2 million plus the assumption of certain pension liabilities. (Jt. Stip., ¶ 122; D–369).

150. A bankruptcy auction sale of most of the then remaining assets of Jeannette Corporation conducted in September 1983 yielded a net amount of approximately $2.15 million. The principal assets sold were the fixed assets and the unsold inventory of Jeannette Glass, as well as the outstanding notes that had been part of the consideration in the sale of the Brookpark division. Some of the assets were promptly resold for an immediate profit. Furthermore, glass tanks were among Jeannette's assets. These tanks, however, had been shut down "cold" before the auction of Jeannette's assets. Once shut down cold, they had essentially scrap value. Therefore, there were valuable assets in the Jeannette Glass Division on July 31, 1981, which were worth only scrap value during the liquidation. (Jt. Stip., ¶ 123; D–89; D–90; D–92; Tr. 19, 93:4–7 (Fontana)).

151. The Schedule B–1, listing real property, filed in Jeannette's bankruptcy case asserted that the market value of the land and buildings of the Jeannette Glass Division was $300,000. Schedule B–2 of Personal Property indicated that the market value of the machinery, fixtures and equipment of the Division was $1.5 million. (P–128; P–128A).

152. Less than a month before trial, plaintiff submitted revised proposed find-

ings of fact to the court which asserted that the parties to the sale of the Jeannette Glass Division's assets attributed $300,000 of the sales price to its real property and $1.6 million to the Division's total personal property. (*See* Tr. 20, 20:4–11, 26:2–14). Furthermore, plaintiff asserted in those revised proposed findings that $.9 million of the proceeds of the Royal China sale were attributed to the land and buildings by the parties to the sale while $1.42 million was attributed to its machinery, equipment, and other non-inventory personalty. (*See* Tr. 20, 26.17–27:33). While we do not rely on these figures as admissions establishing the value of this PP & E, these proposed findings indicate that not even plaintiff thought that Jeannette's PP & E was worthless.

153. Even under extremely unfavorable sale conditions, including several transactions associated with bankruptcy proceedings, the PP & E of Jeannette Corporation and its subsidiaries was disposed of (along with other assets) in transactions in which the consideration totalled over $9 million plus the assumption of various liabilities. There is evidence tending to show that of this amount a significant portion was attributable to the fixed assets sold. Even at those late dates and under those extremely adverse sale conditions, Jeannette Corporation's PP & E continued to be worth millions of dollars.

154. The present fair salable value of the property and equipment of Jeannette Corporation and its subsidiaries in July 1981, was undoubtedly not as high as the $29 million figure arrived at by Manufacturers' Appraisal in 1978. It probably was not even the $17.7 million GAAP value reflected on the balance sheet at July 31, 1981, prior to the sale. Nonetheless, in light of the sales of the assets of several subsidiaries and divisions (in most cases as going concerns) under adverse conditions for substantial sums, the fact that those fixed assets continued to be used in operating businesses after July 31, 1981, and the substantial amounts spent by the company between 1978 and 1981 on capital additions and maintenance, there is no reason to believe that the value of these assets was zero or even close to zero as urged by the plaintiff.

155. Most of Jeannette's PP & E as of July 31, 1981, was sold as part of the liquidation sales of Jeannette's divisions, but nevertheless commanded substantial sums. Jeannette's bankruptcy schedules reflected a value of $1.8 million for its PP & E, while Brookpark's real property was valued by the parties to its sale at over $.5 million. The Old Harbor PP & E was carried on its books at $1.3 million, less accumulated depreciation. These values alone total $3.6 million, and they include no portion of Royal China's PP & E. (Royal China was sold out of bankruptcy for $4.2 million.) On the eve of trial plaintiff, as noted above, had proposed that we find that the parties to the Royal China sale attributed over $2.3 million of the sale price to its PP & E. While we do not rely on these values originally proposed by plaintiff, we certainly think it reasonable to find that the PP & E of Royal China was worth millions of dollars. In addition to the foregoing, Mr. Pfingstler opined that the PP & E was worth over $12 million, some $5 million less than its net book value. We find that the present fair salable value of the property, plant and equipment of Jeannette Corporation and its subsidiaries as of July 31, 1981, was at least $5–6 million, and may have been substantially more.

156. An appraisal as of July 31, 1981, certainly would have helped the court on this issue. We do note, however, that our finding of the minimum value for Jeannette's PP & E was less than 20% of that contained in the Manufacturers' Appraisal Company's appraisal as of September 15, 1978. While the assets may certainly have lost value, substantial sums were spent on maintenance and improvements and Jeannette Corporation continued to function as a going concern until, and after, July 31, 1981. Therefore, we find our minimum figure of $5–6 million to be conservative and reasonable. The only evidence of value of any of the assets plaintiff offered was the July 31, 1981, selling price, and he urged us to find that the PP & E has no

value. We find plaintiff's positions untenable.

157. The goodwill carried on the financial records of Jeannette Corporation had little or no present fair salable value as of July 31, 1981.

158. The other long-term assets on Jeannette Corporation's books at July 31, 1981, included a note receivable that was subsequently collected and other assets that provided continuing benefit to the company's operations. The present fair salable value of these assets as of July 31, 1981, was $119,000.

159. The total of the present fair salable values of all the assets of Jeannette Corporation and its subsidiaries immediately following the July 31, 1981, transaction was at least $26.2 million—$27.2 million, and probably was more.

160. Jeannette Corporation's liability on its accounts payable after the July 31, 1981, transaction was $2.96 million.

161. The current portion of long-term debt (that portion of long-term debt due to be repaid within the next twelve months) of Jeannette Corporation and its subsidiaries after the July 31, 1981, transaction was $500,000.

162. The accrued liabilities of Jeannette Corporation and its subsidiaries after the July 31, 1981, transaction was approximately $4.34 million.

163. The foregoing liabilities, totalling approximately $7.8 million, were all of the liabilities expected to be repaid within the year following July 31, 1981. In contrast, the total current assets were over $21 million. (Tr. 18, 145:12–145:25 (Pfingstler)).

164. The debt to Security Pacific incurred by Jeannette Corporation in the course of the July 31, 1981, transaction was approximately $11,711,000.

165. Although this debt could technically be characterized as a current liability because it was repayable on demand, the parties expected that this would be a long-term lending arrangement in which much of the balance would not have to be paid down for years. Jeannette carried this obligation on its records as a long-term debt,

and no demand was ever made on the loan. (S–12, p. 19).

166. The long-term debt (net of the current portion) of Jeannette Corporation and its subsidiaries after the July 31, 1981, transaction was $1,856,000, which was due and payable over a number of years.

167. Jeannette Corporation incurred, and paid, the acquisition costs associated with the July 31, 1981, transaction. These costs included fees to Mr. Brogan's company, to Bennan & Associates, and to M–K Candle. They also included legal fees and interest expenses. Those liabilities, as of July 31, 1981, totalled approximately $140,000.

168. The liability account for Accrued Pensions on Jeannette's July 31, 1981, Consolidated Balance Sheet is an estimate of the difference between the total vested liabilities that are due participants in the pension plan less the assets of the pension plan, net of a projected or expected tax benefit.

169. As of January 1, 1981, based upon data in the actuarial report of Medinger & Company, Jeannette's actual liability upon termination of its pension plan was estimated to be $3,700,000. (Tr. 17, 8:3–9:24 (Matheny); P–465, pp. 2–3).

170. The total of all the liabilities of Jeannette Corporation and its subsidiaries after the July 31, 1981, transaction was approximately $25.2 million.

■ 171. The present fair salable values of the assets of Jeannette Corporation and its subsidiaries following the July 31, 1981, transaction exceeded their liabilities by at least $1–2 million and most probably by more, given the conservative value we have assigned Jeannette's PP & E. This evidence supports the conclusion that Jeannette was solvent after the July 31, 1981, transaction.

172. Furthermore, following the July 31, 1981, transaction, the total of the present fair salable values of just the current assets of Jeannette Corporation (which excluded any of its PP & E) was roughly equal to the total of all of Jeannette's liabil-

ities, other than pension termination liability. Jeannette's liabilities included millions of dollars not due to be repaid within a year, including the Security Pacific debt.

173. Following the July 31, 1981, transaction, the total of the present fair salable values of the current assets of Jeannette Corporation exceeded the total of its current liabilities, plus the Security Pacific debt. The total of the present fair salable values of the current assets was roughly 2½ times larger than the total of the current liabilities, exclusive of the Security Pacific debt.

174. In the face of the foregoing, the only evidence offered by plaintiff regarding Jeannette's alleged insolvency after the July 31, 1981, transaction was Coke of New York's decision to write down its investment in the Jeannette stock to $9,144,000 and the testimony of Mr. Gustafson, an investment banker and plaintiff's expert witness, that the $12.1 million purchase price was the present fair salable value of Jeannette's assets.

175. When questioned about asset values during closing argument, plaintiff's counsel admitted that the present fair salable value of the accounts receivable was $8.3 million, was unable to suggest an adjustment to the roughly $12 million value attributed to the inventory by defendants, and suggested that the PP & E should be given a value of zero. At three of the four operating divisions, however, those fixed assets have continued to be used in ongoing businesses, and the Jeannette Glass assets, including the PP & E, yielded a substantial sum in the bankruptcy auction. As indicated above, the record will not support anything close to a zero valuation for the PP & E. That plaintiff was forced to resort to such a position illustrates that our conclusion that Jeannette was solvent is reasonable.

*Post–Closing—Jeannette's "Capital"*

176. As set forth below, we believe that the July 31, 1981, transaction did not leave Jeannette Corporation with an unreasonably small capital with which to conduct the business in which it was engaged.

177. Jeannette Corporation continued to operate as an ongoing business after Coke of New York sold its stock in Jeannette Corporation to J. Corp.

178. Testimony was presented at trial on a number of factors relevant to the consideration of whether Jeannette had "unreasonably small capital" after the July 31, 1981, transaction. These factors included net worth or solvency, working capital, profitability, cash flows, access to lines of credit, and ability to retire debt.

179. First as discussed more fully in Findings of Fact 125–174, *supra*, Jeannette was solvent after the July 31, 1981, transaction with a net worth of at least $1–2 million. Jeannette's book value, under GAAP, was substantially higher.

180. Most of Jeannette's assets on July 31, 1981, were also highly liquid. Jeannette's accounts receivable and inventory as of that date were approximately $21 million. In contrast, the liabilities Jeannette would have to pay within the twelve months following July 31, 1981, were approximately $7.8 million. Therefore, Jeannette's working capital structure (current assets minus current liabilities) was also strong after the July 31, 1981, transaction.

181. The observation regarding working capital above does not include the Security Pacific loan as a current liability, because, by the nature of that credit facility, it was not expected by the parties that it would be repaid on a current basis. In looking at the economic reality of Jeannette's capitalization, therefore, it is more appropriate to view the Security Pacific debt as long-term debt. However, even if the entire Security Pacific debt were viewed as a current liability, Jeannette still had positive net working capital, plus access to additional credit under the Security Pacific credit facility, after the July 31, 1981, transaction.

182. As found above, prior to the July 31, 1981, transaction, Jeannette's management, Mr. Brogan, and Security Pacific personnel all projected that Jeannette's operations after that date would be profitable. Brogan and Security Pacific analyzed the effect of the proposed leveraged buyout on

Jeannette and concluded that after that transaction it would be able to pay its creditors, pay the additional interest burden, and operate profitably. These projections were made in good faith and were reasonable and prudent when made.

183. There is no dispute that Jeannette's capital structure changed as a result of the July 31, 1981, transaction. That does not necessarily demonstrate, however, that the remaining capital was unreasonably small to conduct the business of the company.

184. As set forth above, Jeannette's business was cyclical; cash flow and profits were much stronger in the last half of the calendar year than in the first. While Coke of New York owned Jeannette, Jeannette met its working capital needs by borrowing from Coke of New York. When the Brogan group purchased Jeannette, it received the benefits of cash infusions made by Coke of New York in the first seven months of 1981. Jeannette was headed into its strong cash flow period after the July 31, 1981, transaction. In fact, availability on the Security Pacific line started at $2 million as of July 31, 1981, but rapidly rose to $7.4 million in November, 1981. (Tr. 14, 152:23–154:9 (Seiden); S–25; Tr. 13, 231:14–232:4 (Warren)).

185. Throughout the latter half of 1981, Jeannette Corporation's financial reports and projections indicated that the company was operating and would continue to operate profitably, with adequate capital to pay its debts. The first projection in 1982 showed ample availability under the line of credit, healthy sales, and profitable operations. There were no contrary indications until late January 1982, when orders declined and projected sales were reduced. (S–2, S–4, S–5, S–6, S–7, S–9, S–23, S–33, S–34, S–35, S–41, S–44, S–45, S–57, S–160; D–666; Tr. 13, 201:24–204:3 (Warren)).

186. After the July 31, 1981, transaction, Jeannette's peak working capital needs in 1981 were in the months of August and September. In August, Jeannette increased its inventory by over $2.7 million. By the end of December 1981, Jeannette had over $1.7 million more inventory on hand than it did as of December, 1980. (D–921; D–922).

187. Throughout the fall of 1981, during its period of peak demand for working capital, Jeannette had unused availability in excess of $3 million. (S–25).

188. From August through December 1981, Jeannette incurred millions of dollars in liabilities to its vendors. Generally, it paid those vendors on a timely basis. (D–197; Tr. 13, 182:20–183:5 (Warren)).

189. The latter half of the year was Jeannette's strongest selling season; 1981 proved to be no exception. From August through December 1981, Jeannette's net sales were over $31 million, at a gross profit in excess of $6 million. At the end of December it had unused availability on the Security Pacific credit line of over $4 million. (S–57; S–25).

190. Through December 1981, Jeannette had received advances from Security Pacific, excluding the initial $11.7 million, of over $31 million. (D–373).

191. During the first five months after the July 31, 1981, transaction, Jeannette Corporation had positive cash flow from operations of over $3 million. This strong cash flow continued well into 1982. Cash flow greatly exceeded book operating profits because of the high levels of depreciation expense that Jeannette recorded on its books. (Tr. 18, 172:23–174:18 (Pfingstler); D–892).

192. From August 1, 1981 through July 31, 1982, Jeannette made disbursements of $75.2 million. Of this amount, $15.6 million was paid to employees as salary and wages, and $50.2 million was paid to trade and other creditors. (D–870).

193. When Jeannette shut down its furnaces in 1982, it did so because it had an excess of inventory that it was unable to sell. Jeannette workers testified that Jeannette had so much inventory in 1982 that it was stacked outside and in aisles. It was unusual for Jeannette to have this much inventory, which was spread evenly across all product lines. (Tr. 19, 100:2–100:21 (Fontana)).

194. Approximately one year after the July 31, 1981, transaction, Jeannette Corporation had availability on its revolving credit facility with Security Pacific of over $2.3 million, which was more than its starting availability on July 31, 1981. (S–25).

195. After the July 31, 1981, transaction, Security Pacific periodically sent its employees to Jeannette Corporation to conduct "field examinations" or collateral inspections. Prior to September 1982, none of the reports of these visits contained any indication of significant concerns about the company's operations, financial condition, ability to make payments to creditors, or availability. (Tr. 16, 6:20–9:24, 13:16–14:23, 18:19–19:3, 44:15–45:17 (Faraone); D–195, D–197, D–198; D–136).

196. Having gone a full cycle of 12 months, during which Jeannette had paid out to vendors, other creditors, and employees over $75 million, had always met its payroll, had positive cash flows, and had substantial inventory for the coming peak season, Jeannette had more unused availability as of the end of July, 1982 than it did in July, 1981. During this 12 month period it had received advances from Security Pacific of over $77 million, including the initial $11,710,800 advance. The problem it ultimately encountered in 1982 was not capital, but sales.

197. At no time after July 31, 1981, did Jeannette Corporation use up the total availability on its revolving credit facility with Security Pacific. In closing argument, plaintiff suggested that Jeannette did not draw on its availability because of Brogan's fear that M–K Candle would perhaps have to answer on its guarantee. Even if this contention were borne out by the record, and we think that it is not, it may be more indicative of Brogan's poor business judgment than Jeannette's allegedly unreasonably small capital. In any event, Security Pacific was amply protected under the loan documents. Under those documents, Security Pacific's loan was secured by all of Jeannette's assets. The advance rates under the credit facility were set well below the anticipated "knockdown value" (i.e. immediate forced liquidation

sale) of Jeannette's assets so that any advances made by Security Pacific would be adequately secured. We find no support in the record for plaintiff's speculation in closing argument that Jeannette did not draw on the Security Pacific line of credit because of concern for possible exposure on the M–K Candle guarantee.

198. Jeannette Corporation's financial department personnel maintained a running calculation of the current availability on the Security Pacific revolving credit line. All of the witnesses, including plaintiff's expert and Jeannette's Assistant Treasurer, agreed that because of timing differences and other adjustments, the figures on Jeannette's availability schedule as of any particular day generally did not match the availability figure calculated by Security Pacific. (Tr. 7, 169:10–169:25 (Gustafson); Tr. 13, 236:3–236:23 (Warren)).

199. The record amply demonstrates that the Security Pacific records substantially understated the actual net availability and overstated the loan balance at any particular point in time. Much of the difference between the Security Pacific and Jeannette availability records resulted from timing delays relating to Jeannette's notifying Security Pacific of its most recent sales and collections, mail delays from Jeannette to Security Pacific, and Security Pacific's updating inventory figures on only a monthly basis. Therefore, Jeannette's records more accurately stated the actual availability.

200. Although Security Pacific had the ultimate lending determination authority, in all cases the determination was based upon information supplied by the borrower, whether in writing or orally. Security Pacific was routinely willing to make advances to borrowers on the basis of telephone calls from borrowers in which new, "in transit" information was reconciled to the data already on Security Pacific's computer. This information could then be verified when the documentation arrived a few days later. Prior to the bankruptcy, Jeannette personnel actually began communicating such information to Security Pacific by telephone and receiving advances from

Security Pacific based upon these calls. (Tr. 13, 236:25–237:25 (Warren)).

201. At no time after July 31, 1981, did Security Pacific ever refuse any request by Jeannette Corporation for funds under the revolving credit facility. On approximately eight occasions after July 1982, however, Security Pacific suggested that Jeannette draw a smaller amount on the line of credit than originally requested, in light of upcoming large expenses such as payroll. (Tr. 13, 239:3–239:16, 240:22–241:22 (Warren)).

202. Under the revolving credit facility loan documents, Security Pacific was not rigidly bound by the availability calculation as an upper limit on its ability to make loans to Jeannette Corporation. If there was a reason to do so, Security Pacific had the discretion to modify advance rates or determinations of eligible collateral to increase the availability, or to make an advance in excess of the current availability. Where circumstances warranted it on similar revolving credit secured loans, Security Pacific had frequently agreed to make such advances when requested by borrowers. Jeannette Corporation never requested any such excess advances from Security Pacific.

*Jeannette's Payments to Creditors*

203. Historically, Jeannette Corporation's policy and practice was to pay its vendors in accordance with the terms of their invoices.

204. From August through December 1981, during the peak of its business cycle, Jeannette made payments of its accounts payable in the ordinary course of its business, as it had done previously. (Tr. 13, 182:13–183:5 (Warren)).

205. The only change in Jeannette's practices regarding payments to creditors in 1981 was its decision to pay within 45 days, rather than within the historical 30 days, to equalize receipts and payments. This decision occurred in late 1981 or early 1982. Later in 1982 Jeannette then decided, because of weak sales, to begin paying its creditors on a 60 day policy. Eventually, sales proved to be so weak that Jeannette announced an 88 day payment policy. (Tr. 13, 217:11–222:11).

206. From August through December 1981, Jeannette made purchases of approximately $22 million. (D–197, p. 2092).

207. An analysis performed by an Security Pacific field examiner in 1982 reflects that from August 1, 1981, to July 31, 1982, Jeannette's payments of accounts payable were similar to its payments during the twelve months prior to July 31, 1981. (P–178).

208. As noted above, in late February 1982, when Jeannette was encountering a substantial decline in orders and sales, it announced an 88 day payment policy to many of its vendors, but excluded critical vendors.

209. In fact, various creditors negotiated payment terms with Jeannette of varying lengths. There is no evidence in the record that any such creditors were not paid in accordance with those new terms, at least until the second half of 1982. (S–107A; Tr. 3, 133:9–134:12 (Storey)).

210. The adoption of a new payment policy in 1982 in the face of dramatically changed and unforeseen market conditions does not justify a finding that Jeannette was left with unreasonably small capital as a result of the July 31, 1981, transaction.

211. Plaintiff points to the fact that Jeannette's month end accounts payable balance increased substantially from July to August in 1981 and urges us to find from this evidence that the defendants intended to hinder, delay and defraud Jeannette's creditors, and that Jeannette was left with an unreasonably small capital in its hands after the July 31, 1981, transaction. A mere comparison of month-end balances, without any analysis of their composition, does not establish that there was any delay in paying creditors. Indeed, a reasonable explanation for the rise in the payables balance is the combination of the adoption of the 45 day payment policy with increased production by Jeannette. *See* Finding of Fact 186. Jeannette adopted the 45 day policy in an attempt to match its

receipts from accounts receivable and payments on its accounts payable. The record amply demonstrates, however, that Jeannette was moving into its maximum cash generation period and had ample availability under the line of credit. The 45 day policy was not adopted because of inadequate capital. Furthermore, as noted above, the subsequent 60 and 88 day policies were in response to a drastic decrease in sales.

212. Plaintiff elicited testimony from Mr. Storey that, as a result of his first meeting with Mr. Brogan, Jeannette "froze" its payables. Brogan directly disputed that testimony. Leaving to one side the disagreement between Mr. Brogan and Mr. Storey about what was said in the conversation, such a freeze never occurred. The most the record supports is a finding, as noted above, that Jeannette adopted a 45 day payment policy to attempt to match receivables and payables. David Warren, the Assistant Treasurer who was in charge of Jeannette's accounts payable, testified that Jeannette did pay its creditors conscientiously in the months following the buyout and during the 45 and 60 day policies. (Tr. 13, 220:2–12 (Warren)).

213. Of the total amount of almost $2.5 million worth of proofs of claim filed by trade creditors in the Jeannette Corporation bankruptcy, which was filed on October 4, 1982, *over 90 percent were for goods or services provided to Jeannette Corporation subsequent to June 1982. No claim was for goods or services provided prior to July 31, 1981.* All of the trade creditors who dealt with Jeannette presumably had notice of the Security Pacific debt. Furthermore, all of the trade creditors in the bankruptcy had provided Jeannette with goods or services after the July 31, 1981, transaction. Jeannette did not immediately cease paying creditors after the transaction. (D–875; D–876).

*Jeannette's Demise*

214. From late 1981 and into 1982, the American glassware industry in general and Jeannette in particular experienced a shrinking domestic glasswares market, unprecedented increases in foreign competition, dramatic price slashing and dumping of inventory by domestic manufacturers, and an extended recession. (D–905; D–906; D–913; D–943; D–942; D–673; D–900; D–903).

215. Thus, rather than meeting historical levels, orders for, and then sales of, Jeannette's glassware products declined dramatically. Orders started falling off in January 1982. By August and September of 1982, traditionally peak sales months, sales had dropped to 69% and 52%, respectively, of historical sales levels. By October, sales had fallen to 44% of 1981 levels. (D–943).

216. This drop in sales volume led inevitably to severe cash flow problems. (D–912).

217. The drop in orders and projected sales in January 1982 coincided with Mr. Silverberg's departure from Jeannette. Nearly everyone involved in the July 31, 1981, transaction, and Jeannette employees, viewed Mr. Silverberg as the key member of Jeannette management.

218. When orders dropped in 1982, Jeannette was left with an unusually large inventory across its product line that Jeannette management had built up in anticipation of a strong sales year in 1982. (Tr. 19, 100:2–100:21 (Fontana); Tr. 12, 39:2–12 (Brogan)).

219. Although sales did not decline precipitously in the first six months of 1982, during that period of time orders were down, price competition was stiff, and Jeannette personnel believed that one of its major competitors, Anchor Hocking, was undercutting Jeannette's prices in an attempt to put Jeannette out of business. Tr. 5, 118:6–120:11 (McCracken); Tr. 14, 5:22–7:3 (Leon)).

220. In early October 1981, Jeannette began an inventory reduction program at the direction of Mr. Brogan and Robert Janowiak, whom Brogan appointed as Jeannette's new president, in order to reduce inventory levels and raise cash. Under the program, inventory was sold at a 50–60% discount from list prices. While only about 8% of Jeannette's August through Decem-

ber 1981 sales were from this program, it did have the effect of souring customer relations because not all of those customers were offered the discount prices.

221. At Brogan's direction, Jeannette responded to its drop in orders and sales and its excessive inventory in early 1982 by reducing production levels.

222. During February to April of 1982, Brogan discussed with Robert Janowiak the subject of selling off certain of Jeannette Corporation's assets. One of the reasons for considering that possibility was to raise cash to assist Jeannette with its operating needs.

223. One of Jeannette Corporation's three glass tanks was shut down in March 1982. The minutes of the March 11, 1982 board of directors meeting indicate that a total of approximately 635 employees had been laid off by that date at the Jeannette Glass, Royal China and Brookpark plants. Within two months of this shutdown, Anchor Hocking and Libby, two of Jeannette's major competitors, also shut down tanks. (Jt. Stip., ¶ 117; S-161, p. 002; Tr. 13, 101:7-9 (Brogan)).

224. In late February or early March 1982, Jeannette Corporation invoked the 88–day vendor payment policy discussed above. Even after implementing the 88–day policy, Jeannette failed to pay some creditors within the specified time period.

225. A second glass tank at Jeannette was shut down in April, restarted in June for a brief period and then shut down permanently in late July 1982. The third tank was shut down on or about August 1982, and all production activity at the Jeannette Glass Division ceased.

226. Although its furnaces were shut down in September 1982, Jeannette had a large volume of glassware inventory across its product lines.

227. During the second half of 1982, the bottom had dropped out of the market for Jeannette's products. Jeannette's competitors closed entire plants and dumped inventory at drastically reduced prices. Jeannette's competitors, including Anchor Hocking, had a peculiar opportunity to take advantage of Jeannette in this market environment, having been given Jeannette's proprietary and confidential marketing information and customer lists when Coke of New York was trying to sell Jeannette. (Tr. 5, 119:1–120:11 (McCracken); Tr. 14, 5:22–7:3 (Leon)).

228. The foregoing difficulties developed and grew at a time when Mr. Brogan had little or no ability to help respond to them. Throughout the summer of 1982 he was under doctors' orders to stay away from work while he recovered from his kidney transplant operation. By the time he returned to work in September 1982, the company was facing serious difficulties, including failures to pay creditors in accordance with the payment terms that had been established with them. Although many of the problems which beset Jeannette during this period were beyond the control of management, see Finding of Fact 214, Brogan's ill health certainly was an aggravating factor. (Tr. 12, 125:5–126:1 (Brogan)).

229. Jeannette's loss of sales, and consequent cash flow loss, resulted in its paying its creditors on an erratic basis.

230. An involuntary bankruptcy petition was filed against Jeannette Corporation on October 4, 1982 under Chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the Western District of Pennsylvania. (Jt. Stip., ¶ 119).

231. On December 10, 1982, the bankruptcy case was converted to a voluntary case under Chapter 11, with Jeannette Corporation as a debtor-in-possession. Eventually, plaintiff was appointed trustee. On May 1, 1990, this court converted the bankruptcy case to one under Chapter 7. (Jt. Stip., ¶ 121).

232. Three of Jeannette's four businesses were sold as going concerns and continued operating under other owners, but production ceased at the Jeannette Glass facility in the latter half of 1982 and never resumed.

*Factors Contributing to Jeannette's Failure*

233. The principal causes of the failure of Jeannette Corporation—most specifical-

ly, the Jeannette Glass division—were the substantial drop in orders and sales that began in 1982, as a result of increased foreign and domestic competition and as a result of the continued recession. The effects of the unfavorable market conditions on Jeannette were more severe in light of management mistakes made by Jeannette, including the inventory reduction program, the 1982 inventory build-up, the improper management of creditor relationships, and Mr. Brogan's failure to either relinquish control or set a sound course for Jeannette while he was unable to work because of his kidney problems. These unanticipated events and management errors were exacerbated by the stigma resulting from the filing of the October 4, 1982, bankruptcy petition.

234. In the 14 months following the buyout, substantial amounts were paid by Jeannette to Mr. Brogan, members of his investor group, and long-time members of Jeannette's management in the form of salaries, directors' fees, incentive bonuses, commissions, management fees and the like. Depending on what items are included, the total of such payments was over $1 million. At least with the benefit of hindsight, one may well question whether all of these payments reflected wise business judgments. Similarly, Jeannette's inventory reduction program in late 1981 created marketing difficulties for the company in 1982. While there likely were mistakes made, and while those mistakes arguably

exacerbated the difficulties Jeannette began to experience in late 1982, the fraudulent conveyance laws were not designed to insure creditors against all possible consequences of a company's post-leveraged buyout errors in judgment or poor business practices.

235. Based upon the foregoing factors, defendants proved that after the July 31 transaction Jeannette was not left with an unreasonably small capital in its hands to conduct its business in the ordinary course, and in substantially the same manner as it had prior to the sale of its stock to J Corp. Jeannette's property was sufficient for it to carry on its business until it experienced an unforeseen dramatic decline in its orders and sales.

*Legal Discussion and Conclusions of Law*

In Counts Two, Three and Five of the amended complaint, plaintiff attacks Jeannette's conveyance of the initial $11.7 million advance to J. Corp., Jeannette's granting security interests and assuming obligations under the terms of its loan from Security Pacific, and Jeannette's repayment of that loan. In support of these attacks, plaintiff relies on the intentional and constructive fraud provisions of Pennsylvania's version of the Uniform Fraudulent Conveyance Act,[6] as well as 11 U.S.C. §§ 548–9. We address 39 Pa.Stat. § 357 and § 356 first.[7]

---

6. The trustee relies on 11 U.S.C. § 544(b) of the United States Bankruptcy Code to assert his claims under Pennsylvania law. That statute permits a trustee in bankruptcy to avoid "any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by ... a creditor holding an unsecured claim...." 11 U.S.C. § 544(b). Under § 544(b), the trustee "stands in the overshoes of the debtor corporation's unsecured creditors." *In re Agricultural Research and Technology Group*, 916 F.2d 528, 534 (9th Cir.1990). In this case, it is undisputed that Mellon Bank was an unsecured creditor of Jeannette as of July 31, 1981, and as of the date of the bankruptcy. Therefore, the trustee may attack the July 31, 1981, transaction under § 544(b). *See generally, 4 Collier on Bankruptcy*, § 544.03[1] (15th ed. 1990). We have jurisdiction over this case under 28 U.S.C. §§ 1331 and 1334.

7. As an initial matter, we hold that the fraudulent conveyance laws apply to a leveraged buyout such as the one here. This conclusion is mandated by the decision in *United States v. Tabor Court Realty*, 803 F.2d 1288 (3d Cir.1986). *Tabor Court* did involve an intentionally fraudulent conveyance, unlike this case. 803 F.2d at 1304. In holding that the fraudulent conveyance laws applied in *Tabor Court*, the United States Court of Appeals for the Third Circuit did note that regardless of the policy arguments against application of those laws, "the circumstances of this case justify application." 803 F.2d at 1297. We do not believe that this statement was meant to encourage district court forays into legislating exceptions for some leveraged buyouts and not others. In the words of the *Tabor Court* opinion, "[i]f the UFCA is not to be applied to leveraged buy-outs, it should be for the state legislators, not the courts, to decide." *Id.*

### Intentional Fraud

The Pennsylvania Act provides: Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors. 39 Pa.Stat. § 357. A plaintiff bears the burden of demonstrating intent through "clear and convincing evidence." *United States v. Gleneagles Investment Co., Inc.,* 565 F.Supp. 556, 580 (M.D.Pa.1983), *aff'd in part and remanded, United States v. Tabor Court Realty Corp.,* 803 F.2d 1288 (3d Cir.1986), *cert. denied sub nom., McClellan Realty Co. v. United States,* 483 U.S. 1005, 107 S.Ct. 3229, 97 L.Ed.2d 735 (1987); *In re Pinto Trucking Service, Inc.,* 93 B.R. 379, 386 (Bankr.E.D.Pa.1988). Intent is often difficult to prove, however, and a plaintiff may meet his burden under § 357 by introducing evidence which supports an inference of intent:

> Under Pennsylvania law, an intent to hinder, delay, or defraud creditors may be inferred from transfers in which consideration is lacking and where the transferer and transferee have knowledge of the claims of creditors and know that the creditors cannot be paid. *Godina v. Oswald,* 206 Pa.Super. 51, 55, 211 A.2d 91, 93 (1965).

*Tabor Court,* 803 F.2d at 1304.

A court may infer intent to defraud from subsequent conduct. *Id.; Voest–Alpine Trading USA Corp. v. Vantage Steel Corp.,* 919 F.2d 206, 214 (3d Cir.1990); *Godina,* 206 Pa.Super. at 55, 211 A.2d at 93; *Sheffit v. Koff,* 175 Pa.Super. 37, 41, 100 A.2d 393, 395 (1953). *See also Wieboldt Stores, Inc. v. Schottenstein,* 94 B.R. 488, 504 (N.D.Ill.1988). In considering whether it is proper to infer intent, courts also have looked to the so-called "badges of fraud." *In re Pinto Trucking,* 93 B.R. at 386 (applying the list of "badges of fraud" set forth in § 4B of the Uniform Fraudulent Transfers Act, which Pennsylvania has

not enacted); *In re Compton,* 70 B.R. 60, 62 (Bankr.W.D.Pa.1987); *Wieboldt Stores,* 94 B.R. at 504; *4 Collier on Bankruptcy,* ¶ 548.02[5] (15th ed. 1990).

We need not tarry with this issue. While the transfers Jeannette made were without fair consideration, as discussed below, defendants did not know or believe that Jeannette's creditors could not be paid, and did not intend to hinder, defraud, or delay creditors. As set forth above in Findings of Fact 97–99, and 112, we think that it is abundantly clear that the Brogan group, Security Pacific, and Coke of New York all expected Jeannette Corporation to succeed under Brogan's management and under the financing arrangement Brogan had entered into with Security Pacific. They and Jeannette had no reason, motive, or intent to hinder, delay, or defraud creditors. *Compare, e.g., Voest–Alpine,* 919 F.2d at 210, 214; *Fidelity Trust Co. v. Union National Bank of Pittsburgh,* 313 Pa. 467, 480, 169 A. 209, 215 (1933), *cert. denied,* 291 U.S. 680, 54 S.Ct. 530, 78 L.Ed. 1068 (1934).

Indeed, the defendants hoped to profit from Jeannette's success as an ongoing business. *See, e.g., In re Knox Kreations, Inc.,* 474 F.Supp. 567, 571 (E.D.Tenn. 1979), *aff'd in part and rev'd in part,* 656 F.2d 230 (6th Cir.1981). Brogan anticipated making a substantial amount of money and Security Pacific anticipated an ongoing lending relationship with Jeannette at a rate of prime plus 3¼ percentage points. Furthermore, Coke of New York would have been relieved of the prospect of being held responsible for Jeannette's unfunded pension liabilities. We are convinced from the above and from the evidence at trial that all of the parties entered into the Jeannette transaction with the intent that it be successful and not with "[a] general scheme or plan to strip the debtor of its assets without regard to the need of its creditors." *Wieboldt Stores,* 94 B.R. at 504.[8]

---

8. It is true that the Brogans took relatively large bonuses for themselves and granted the same to others, that they rented a BMW automobile for Robert Janowiak, and that numerous invoices of Mr. Brogan's were paid promptly and earlier than those of other creditors. All of this be-

Our finding in this regard is supported by the distinctions between this case and two recent Third Circuit cases which affirmed findings of intentional fraud. *Tabor Court*, for example, dealt with a transferor which had been unprofitable for several years before the transfers at issue and which was in serious financial difficulties within two months of the transfers, at the latest. 803 F.2d at 1293, 1297. The transferor was severely in debt, could not pay its bills, and could not fulfill its contracts. *Id.*, at 1293. There was no evidence that the conveyances at issue were part of a legitimate business transaction.

*Voest–Alpine* presented a more transparently fraudulent scheme. The defendants were the owners of a financially troubled business, who wished to put the assets of the business out of creditors' reach and to preserve their equity in a new business. 919 F.2d at 210. To accomplish their objectives, the defendants formed a new company and concealed their interest in it. They then caused the old company's lender to foreclose on the old company's assets. The new company purchased those assets at deflated prices. In writing to creditors of the old company, the defendants claimed that it had suffered a foreclosure upon and sale of all its assets. They did not reveal, however, that their new company purchased the assets at deflated prices. 919 F.2d at 210. On those facts, the Court of Appeals had no difficulty affirming a finding of intentional fraud. *Id.*, at 214.

Unlike these cases, the defendants here did not conceal the nature of the transaction. In fact, there was testimony that not only all of Jeannette's personnel, but also nearly everyone in the town of Jeannette knew of the transaction. Furthermore, Jeannette continued to operate as an ongoing business and to pay its creditors for over a year after the transfer. While many of Brogan's actions bespeak an intent to profit handsomely from ownership of Jeannette, they do not reveal an intent to hinder, defraud, and delay creditors. Similarly, Security Pacific intended to profit from

an ongoing lending relationship with Jeannette, rather than to hinder, defraud, and delay creditors. Finally, Coke of New York did receive over $12 million for Jeannette's stock. Nevertheless, it had paid some $40 million for the company in 1978, and had agreed to sell it for $19 million a few months before the July 31, 1981, transaction. Coke of New York sold Jeannette, at a substantial loss, to focus on its core businesses, rather than to defraud Jeannette's creditors. There is no basis on this record for us to find or to infer that Jeannette or any of the defendants intended to defraud Jeannette's creditors.

We reach the same conclusion after examining the "badges of fraud" used by some courts. *See In re Pinto Trucking Service, Inc.*, 93 B.R. at 386; *In re Compton*, 70 B.R. at 62; *Wieboldt Stores*, 94 B.R. at 504. The transfer here was not concealed, nor made when the transferor was threatened with suit. Jeannette also did not abscond with, remove, or conceal assets. *See In re Pinto Trucking*, 93 B.R. at 386. Furthermore, the transfer was not a sham designed to permit a transferor to retain possession or control of property allegedly transferred. *Id., Voest–Alpine*, 919 F.2d at 211. Plaintiff has not met his burden of proving through "clear and convincing evidence" that the conveyances at issue here were made with the actual intent to hinder, defraud, or delay creditors.

We also find that the plaintiff has failed to prove that there was a fraudulent conveyance under 39 Pa.Stat. § 356. That section provides:

Every conveyance made and every obligation incurred without fair consideration, when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors.

39 Pa.Stat. § 356. *See Gleneagles*, 565 F.Supp. at 582–583. As discussed below,

speaks an intent to profit from his operation and control of Jeannette Corporation. While these payments may indicate questionable business judgment, they do not prove an intent to hinder, delay, or defraud creditors in light of all the evidence adduced at trial.

we do find that the transfers here were made without fair consideration. Nevertheless, plaintiff should not recover under § 356. We have found that defendants are not liable to plaintiff under § 357 of the Pennsylvania Act. For substantially the same reasons, we find that Jeannette Corporation, through the defendants, did not enter into obligations or make conveyances intending or believing that it would "incur debts beyond [its] ability to pay as they mature." Rather, the defendants intended and believed that Jeannette would prosper, and would be able to pay its debts in a timely manner.

### Constructive Fraud

■ Plaintiff also attacks the conveyances in this case as constructively fraudulent. First, he contends that the conveyances should be set aside as conveyances by an insolvent. The Pennsylvania Act provides:

> Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent, is fraudulent as to creditors, without regard to his actual intent, if the conveyance is made or the obligation is incurred without a fair consideration.

39 Pa.Stat. § 354. In analyzing the conveyances in this case, we are convinced that we should "collapse" the various steps in the July 31, 1981, leveraged buyout and treat them as "one integral transaction." *Voest–Alpine*, 919 F.2d at 212; *Tabor Court*, 803 F.2d at 1302. *See* Queenan, *The Collapsed Leveraged Buyout and the Trustee in Bankruptcy*, 11 Cardozo L.Rev. 1, 26 (1989). Security Pacific would never have made the initial unsecured loan to J. Corp. without being assured of a first security interest in all of Jeannette's assets. Without the funds from Security Pacific, J. Corp. obviously could not purchase Jeannette Corporation from Coke of New York, which, therefore, could not have received the $12.1 million. No part of the July 31, 1981, transaction would have taken place

without the occurrence of all of the other parts. Finding of Fact 107.

Under § 354, we may set aside the conveyances only if Jeannette Corporation was rendered insolvent by the July 31, 1981, transaction,[9] and if the conveyances were made and the obligations incurred "without a fair consideration." Under the Pennsylvania Act:

> Fair consideration is given for property or obligation:
> (a) When, in exchange for such property or obligation, as a fair equivalent therefor and in good faith, property is conveyed or an antecedent debt is satisfied; or
> (b) When such property or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property or obligation obtained.

39 Pa.Stat. § 353.

■ In exchange for undertaking to repay an $11.7 million loan at 3¼ percent above the prime interest rate, and for granting security interests to Security Pacific to insure repayment of that loan, Jeannette Corporation received nothing which would constitute fair consideration. Finding of Fact 108. The funds Security Pacific provided went to J. Corp., and then to Coke of New York. None of the initial $11.7 million advance was used for the operation of Jeannette's business.

■ Jeannette did receive access to additional funds under the revolving line of credit, and new management. While these may have been worth something, they were woefully inadequate consideration for the obligations Jeannette Corporation assumed. Access to working capital is valuable, but it is not fair consideration for undertaking to pay an $11.7 million loan at 3¼ percent above the prime interest rate when the loan proceeds actually went to a parent corporation. *Credit Managers Association of Southern California v. Federal Company*, 629 F.Supp. 175, 182 (C.D.Cal.1985).

---

**9.** There is no dispute that Jeannette Corporation was solvent prior to the July 31, 1981 transaction.

Furthermore, we agree with those courts which have held that new management "does not fall within the definition of fair consideration." *Gleneagles,* 565 F.Supp. at 576; *Credit Managers,* 629 F.Supp. at 182. *See* Queenan, pp. 8–13. The transfers made by Jeannette were made for less than a fair consideration. *See In re Ohio Corrugating Co.,* 91 B.R. 430, 436 (Bankr.N.D. Ohio 1988); Cieri, Heiman, Henze, Jenks, Kirschner, Riley, & Sullivan, *An Introduction to Legal and Practical Considerations in the Restructuring of Troubled Leveraged Buyouts,* 45 Bus.Law 333, 354 (1989) (expressing doubt that any leveraged buyout could meet the fair consideration standards).

■ We may not set aside Jeannette's conveyances, although made for less than a fair consideration, unless we decide that Jeannette was rendered insolvent by the July 31, 1981, transaction. As a preliminary matter, we must resolve the question of who bears the burden of proof on this issue. The case law seems to support the plaintiff's argument that the burden shifts to the proponent of the transfer if its opponent proves the transfer was for less than a fair consideration. *Gleneagles,* 565 F.Supp. at 577; *In re Ohio Corrugating Co.,* 70 B.R. 920, 927 (Bankr.N.D.Ohio 1987) (under Ohio fraudulent conveyance law the burden to prove solvency shifts to the defendant upon a showing of less than fair consideration). *See In re Pinto,* 93 B.R. at 388. *Compare, Kupetz v. Continental Illinois National Bank & Trust Co.,* 77 B.R. 754, 762 (C.D.Cal.1987), *aff'd sub nom., Kupetz v. Wolf,* 845 F.2d 842 (9th Cir.1988), and *In re O'Day Corp.,* 126 B.R. 370, 390 (Bankr.D.Mass.1991) (under Massachusetts law trustee carries the burden of proving solvency, while under Pennsylvania law the burden to prove solvency shifts to the defendants). More precisely, Pennsylvania courts hold that if the transferor was "in debt," then the transferee must establish by clear and convincing evidence either "that the person conveying was then solvent and was not by such conveyance rendered insolvent or that a fair consideration had been paid for the conveyance." *First National Bank of Marietta v. Hoffines,* 429 Pa. 109, 114, 239 A.2d 458, 462 (1968); *In re Glenn,* 108 B.R. 70, 75 (Bankr.W.D.Pa.1989). Since the conveyances here clearly were not for "a fair consideration," the only true issue in the case under § 354 is whether Jeannette was rendered insolvent by the July 31, 1981, transaction.

Our review of the case law under the Pennsylvania Act convinces us, as it did the *Gleneagles* court, that the weight of authority clearly does support the conclusion that the burden of proving solvency rests with the defendants because the conveyances were not made for fair consideration and because Jeannette was "in debt" at the time of the conveyances. *See, e.g., Gleneagles,* 565 F.Supp. at 577; *In re Joshua Slocum Ltd.,* 103 B.R. 610, 620 (Bankr.E.D.Pa.), *aff'd,* 121 B.R. 442 (E.D.Pa.1989); *In re Leinheiser,* 51 B.R. 164, 166 (Bankr.E.D.Pa.1985); *Baker v. Geist,* 457 Pa. 73, 78, 321 A.2d 634, 637 (1974).

The defendants have argued that they should not bear the burden of proof in this case because it does not involve an interfamilial transfer. Pennsylvania courts do give heightened scrutiny to transfers between spouses for nominal or inadequate consideration. They have adopted the rule that such a conveyance "is presumptively fraudulent as to the [spouse's] creditors." *Speiser v. Schmidt,* 387 Pa.Super. 30, 38, 563 A.2d 927, 931 (1989), *quoting Hoffines,* 429 Pa. at 115, 239 A.2d at 463. This does not mandate a holding, however, that the burden of proving solvency has not passed to the defendants here.

■ First, Pennsylvania courts appear to treat the presumption in cases involving spouses as distinct from the rule shifting the burden of proof on the solvency issue to the transferee. *See Hoffines,* 429 Pa. at 114–115, 239 A.2d at 462–463; *Speiser,* 387 Pa.Super. at 37–38, 563 A.2d at 931. Furthermore, "this allocation of the burden of proof has never expressly been restricted only to cases involving transfers between related parties." *Soda Rental Service, Inc. v. Ford,* 334 Pa.Super. 486, 491 n. 2, 483 A.2d 556, 559 n. 2 (1984).

**994**

*See, e.g., Gleneagles,* 565 F.Supp. at 577. Finally, there is no reason to hold that the rule is limited to interfamilial transfers. In a complex transaction such as this one, we see nothing warranting an exception to the general rule that a recipient of a conveyance made for less than a fair consideration must bear the burden of proving the transferor's solvency. As discussed below, we believe that the defendants have met their burden.[10] The Pennsylvania Act defines insolvency as follows:

> A person is insolvent when the present, fair, salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured.

39 Pa.Stat. § 352(1). Pennsylvania courts have held that this solvency definition contains two components. First, in the bankruptcy sense, a transferor may be insolvent if it has "a deficit net worth." *Larrimer v. Feeney,* 411 Pa. 604, 608, 192 A.2d 351, 353 (1963). Second, insolvency "in the equity sense" means "the inability to meet obligations as they mature." *Id.*

■ As plaintiff points out, Pennsylvania courts have emphasized that the word "present" should not be read out of the definition of insolvency. *Larrimer,* 411 Pa. at 608, 192 A.2d at 353; *Fidelity Trust,* 313 Pa. at 474–475, 169 A. at 213; *Gleneagles,* 565 F.Supp. at 578. Plaintiff, therefore, urges us to attribute no value to Jeannette's PP & E because it was not readily salable as of July 31, 1981. We must be careful, however, not to apply reflexively the word "present" without considering why the Pennsylvania courts have emphasized the word and what a reasonable construction of the word "present" entails. Indeed, the illiquid nature of assets "is not dispositive of the issue of solvency." *Gleneagles,* 565 F.Supp. at 579. The cases demonstrate that we must determine whether the present fair salable value of Jeannette's assets "are less than the amount required to pay existing debts *as they mature.*" *Larrimer,* 411 Pa. at 608, 192 A.2d at 353 (emphasis added). *See Gleneagles,* 565 F.Supp. at 578. While the PP & E here was specialized property related to the manufacture of housewares and presumably could not be sold on a moment's notice, the cases do not mandate that we assign it no value.

For example, the transferor in *Fidelity Trust* was engaged in unlawful stock speculation and fraudulent conduct involving a bank of which he was president. The transferor inflated the market value of the bank's stock, by causing the bank to purchase it. 313 Pa. at 473, 169 A. at 212. He engaged in this scheme because the stock was actually worthless and because he owned a large number of shares, all of which were pledged as security for his loans, which were payable on demand. 313 Pa. at 474, 169 A. at 212. Shortly before the transfers at issue, bank examiners discovered the dire financial condition of the bank. On these facts, the Pennsylvania Supreme Court held that it was error for the lower court to ascertain the stock's "fair salable value" without consideration of its "present" value. 313 Pa. at 474–475, 169 A. at 213. The court was concerned because the transferor knew that the actual value of the stock was far below the value at which the stock was trading, in part because of his own fraudulent conduct.

■ *Fidelity Trust* thus held that an exception to the general rule that market values are controlling in determining

---

**10.** If the burden of proof did not shift to the defendants, however, we would hold that the plaintiff has failed to prove that Jeannette Corporation was rendered insolvent by the July 31, 1981 transaction. Plaintiff's evidence on this issue was the selling price and transaction costs of J. Corp.'s purchase of Jeannette. While the price J. Corp. paid for the stock of Jeannette Corporation is certainly evidence of the net value of Jeannette Corporation's assets, it is not conclusive evidence of that value. Indeed, the record clearly supports our conclusion that J. Corp. purchased the stock of Jeannette Corporation from Coke of New York at a bargain price. Therefore, we could not and would not find that Jeannette was rendered insolvent by the July 31, 1981 transaction based upon the analysis advanced by the plaintiff and the plaintiff's expert. To the extent that this conclusion is inconsistent with the holding of the Bankruptcy Court in *In re Metro Communications,* 95 B.R. 921, 934 (Bankr.W.D.Pa.1989), we do not follow it.

present fair salable value was in order. 313 Pa. at 475, 169 A. at 213. The Pennsylvania Supreme Court believed the lower court erred in failing to examine the facts to ascertain the true value of the stock. *Id. Fidelity Trust* obviously did not involve a business with valuable assets but only a limited market for those assets, such as Jeannette Corporation, and does not mandate that Jeannette's PP & E be assigned no value. At a logical extreme, a strict reading of the word "present" would require the defendants to shoulder the burden of proving that all of Jeannette's assets could be sold within a few days. We are convinced that the law does not require this. Rather, *Fidelity Trust* stands for the proposition that we may not ignore the economic realities of the transfer before us.

Similarly, *Gleneagles* does not require us to consider Jeannette's PP & E worthless. *Gleneagles* was concerned that the excess lands owned by the transferor were "highly illiquid assets which could not be sold except over an extended period of time." 565 F.Supp. at 579. Nevertheless, the court did not hold that the lands were worthless. Rather, it held that their value "did not exceed or even approach the [transferor's] debts and could not produce enough cash to pay the debts of the [transferor] as they matured." *Id.* The transferor in *Gleneagles* was unable to pay routine expenses such as utilities immediately after the transfers except by liquidating mining equipment, 565 F.Supp. at 572, and its financial and tax situations were such that sales of the surplus lands at issue actually produced a cash loss. *Id.* at 569. Therefore, the surplus lands did not have sufficient value for the transferor to meet its debts as they matured.

■■■ In contrast to *Gleneagles*, this case involved a transferor which was able to pay its debts immediately after the July 31, 1981, transaction. Other than the Security Pacific debt, Jeannette's current assets far exceeded all of its liabilities. The record amply supports our conclusion that the parties did not expect Jeannette to repay the Security Pacific loan in the short term, even though it was classified as a demand loan. While Jeannette's PP & E could perhaps not be sold immediately, therefore, there is nothing on this record to support the conclusion that it had to be sold immediately to pay Jeannette's debts "as they mature[d]." *Larrimer*, 411 Pa. at 608, 192 A.2d at 353. *Compare Gleneagles*, 565 F.Supp. at 572. We conclude that to determine the "present fair salable value" of Jeannette's PP & E, we need not presume an immediately available market and we decline plaintiff's invitation to assign these assets no value.

■■■ In considering the "present" fair salable value of Jeannette's assets, including its PP & E, we hold that we must value them on a going concern basis, rather than on a liquidation basis. Several courts which have considered fraudulent conveyance suits have held that courts should use going concern values rather than liquidation values, unless the company's failure is clearly imminent. *See, e.g., In re Ohio Corrugating*, 91 B.R. at 437 n. 7, 438; *In re Vadnais Lumber Supply, Inc.*, 100 B.R. 127, 131 (Bankr.D.Mass.1989); *Credit Managers*, 629 F.Supp. at 187 (considering value of licenses, which could not be sold, because they produced a stream of income and "have some value"). *See Voest–Alpine*, 919 F.2d at 213. Jeannette was not a company whose failure was clearly imminent on July 31, 1981. Jeannette's assets, including its PP & E, had substantial value. As set forth in Findings of Fact 140–156, we believe the present fair salable value of that PP & E was approximately $5–6 million. Our findings of fact regarding that present fair salable value are rather conservative in comparison to Jeannette's probable liability on its debts "as they mature." *Larrimer*, 411 Pa. at 608, 192 A.2d at 353. Furthermore, based on Findings of Fact 125–175, we find that Jeannette Corporation certainly was solvent after the July 31, 1981, transaction in the "bankruptcy sense." This conclusion follows not only from Jeannette's net worth on its balance sheet, *see In re Joshua Slocum*, 103 B.R. at 623–624; *Ohio Corrugating*, 91 B.R. at 438 (both using GAAP values as starting points in solvency analysis), but

also from our detailed examination of its assets and liabilities.

Pennsylvania courts also hold that one may be insolvent under the Pennsylvania Act in an "equitable" sense. "Insolvency in the equity sense .... is the inability to meet obligations as they mature." *Larrimer*, 411 Pa. at 607, 192 A.2d at 353. The equity component of insolvency "conceives of it as a *status* or *condition* to be differentiated from mere symptomatic occurrences such as chronic defaults in current payments." *Id.* We must decide whether Jeannette Corporation was insolvent in this sense as well.

Our analysis and findings of fact with respect to Jeannette's equitable insolvency apply also to the issue of whether Jeannette was left with an unreasonably small capital for the business in which it was engaged, under § 355 of the Pennsylvania Act. Courts finding that a conveyance was made by a transferor who was thereby rendered insolvent often also find that the transfer violates § 355 of the Pennsylvania Act. *See, e.g., Gleneagles*, 565 F.Supp. at 580; *In re Pinto*, 89 B.R. 486, 501 (Bankr. E.D.Pa.1988). Under that section:

> Every conveyance made without fair consideration, when the person making it is engaged, or is about to engage, in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors, and as to other persons who become creditors during the continuance of such business or transaction, without regard to his actual intent.

39 Pa.Stat. § 355.

■ This equation of "insolvency" and "unreasonably small capital" has been criticized as an "unwarranted *per se* rule." Markell, *Toward True and Plain Dealing: A Theory of Fraudulent Transfers Involving Unreasonably Small Capital*, 21 Ind. L.Rev. 469, 492 (1988). The "equity" component of the Pennsylvania Act's definition of insolvency, however, is concerned with "a *status* or *condition* " of being unable to pay one's debts as they become due. *Larrimer*, 411 Pa. at 608, 192 A.2d at 353.

Likewise, § 355 is concerned with protecting present and future creditors from a business which is unable to pay its debts. *See Fidelity Trust*, 313 Pa. at 482, 169 A. at 215–216. In addressing both issues, we must consider whether Jeannette would be able to meet its obligations as it carried on its business. While we may agree that "insolvency" should be conceptually distinct from "unreasonably small capital," the equity component of the Pennsylvania Act's definition of insolvency renders them nearly the same. Therefore, we will discuss the two issues together.

■ In addressing these issues, we first note that a company may be adequately capitalized even if it is not "sufficiently well capitalized to withstand any and all setbacks to [its] business." *Credit Managers*, 629 F.Supp. at 187. Furthermore, we view the question of the adequacy of that capitalization as of the date of the transaction, *Credit Managers*, 629 F.Supp. at 187; *In re Vadnais Lumber*, 100 B.R. at 139, although adequacy of capitalization should also encompass a reasonable period of time after the transaction. *Barrett v. Continental Illinois Bank and Trust*, 882 F.2d 1, 4 (1st Cir.1989), *cert. denied,* — U.S. ——, 110 S.Ct. 1476, 108 L.Ed.2d 613 (1990). Likewise, Pennsylvania courts consider insolvency as of the date of the transaction at issue. *Angier v. Worrell*, 346 Pa. 450, 453–454, 31 A.2d 87, 89 (1943). In arriving at a proper capital structure for a company, parties may rely upon reasonable cash flow projections made at the time of the transaction. *Credit Managers*, 629 F.Supp. at 187. *See In re O'Day Corp.*, 126 B.R. at 405–07 (holding that projections in the case before it, unlike those in *Credit Managers*, were unreasonable). As stated in Findings of Fact 79, 88, 90, 94, 99, 112, and 182, we have concluded that the financial projections made by the defendants were indeed reasonable and prudent when made. Had the projected results come to pass, Jeannette would have been a successful company.

Also important in our analysis is the proper characterization of availability under the Security Pacific line of credit. De-

fendants argue that "capital" should include "reasonably foreseeable future cash flow" whether from operations, equity, or cash "from secured or unsecured loans over the relevant period." Markell, at 496; *Credit Managers*, 629 F.Supp. at 184, 186 (financing company's agreement to lend further amounts supports finding that the company was not undercapitalized, even though adjusted projections showed negative cash flow).

Plaintiffs counter this argument by claiming that the Pennsylvania Supreme Court has held that access to credit is not sufficient. While holding that the transferor in *Fidelity Trust* had engaged in an intentionally fraudulent conveyance, 313 Pa. at 481, 169 A. at 215, the Pennsylvania Supreme Court also held that the transferor violated the constructive fraud sections of the Act. In so holding, the court was unimpressed by the transferor's ability to trade on credit. The court concluded:

> what he did to this end was done by concealment and false pretenses, made with knowledge that they were false. Such false pretenses support the inferences of actual intent. In dealing with this element of credit, it must be remembered "that the test of a trader's insolvency is ability to pay his debts in the ordinary course, not inability to raise the money for them in the ordinary course."

313 Pa. at 480, 169 A. at 215 (footnote and citations omitted). This ability to trade on credit did not establish the transferor's solvency. Furthermore, the transferor was engaged in business with an unreasonably small capital because "the possibility of continuing operations depended on the manipulation of equities in a widely fluctuating stock market." 313 Pa. at 482, 169 A. at 215.

Similarly, *Larrimer* involved a transferor who was engaged in the business of "buying and selling of listed and unlisted securities." 411 Pa. at 605, 192 A.2d at 352. After finding that the transferor had a deficit net worth for some four years in a row, the court went on to reject the contention that the transferor was solvent because he was able to pay his debts through borrowing funds at excessive interest rates:

> [The transferor's] sanguine expectations that the stock market would fluctuate sufficiently were in vain. He was neither able to meet his debts in the ordinary course of business, nor was the present fair salable value of his assets sufficient to meet his existing debts as they matured. He was insolvent from December 31, 1952, to the date of his adjudication.

411 Pa. at 605, 192 A.2d at 354. The transferors in *Fidelity Trust* and in *Larrimer* were found to be engaged in business with an unreasonably small capital and to be insolvent in the equity sense, respectively.[11] Their trading on credit in the hopes that the stock market and the value of their assets would rise did not forestall the courts' conclusions.

■■ *Fidelity Trust* and *Larrimer* are distinguishable and do not compel the conclusion that we should find Jeannette insolvent or left with unreasonably small capital merely because Security Pacific provided it with its working capital. While the transaction here may have involved risk, it was not at all like a transferor's borrowing funds at excessive rates with "sanguine expectations" that the stock market would rise. *Larrimer*, 411 Pa. at 609, 192 A.2d at 354. *See Fidelity Trust*, 313 Pa. at 482, 169 A. at 215. Rather, the defendants relied on their reasonable projections, and the projections of Jeannette management, that Jeannette's sales would stay relatively constant or improve. Jeannette was a successful company over the years, and the Brogan group had the benefit of the continued presence of Jeannette management, including Mr. Silverberg. The financing of Jeannette's working capital through a revolving line of credit does not answer the question of whether it was left with unreasonably small capital. Rather, we must analyze the

---

**11.** The transferor in *Fidelity Trust* had a positive net worth of less than $80,000. 313 Pa. at 476, 169 A. at 213.

adequacy of that line of credit. *See Gleneagles*, 565 F.Supp. at 579 (company would be solvent if "the operation of its business produced sufficient cash for the payment of its debts as they matured"); *Credit Managers*, 629 F.Supp. at 184.

■ As set forth above in Finding of Fact 199, to determine the true availability under the Security Pacific line of credit we must refer to Jeannette's books and records. Jeannette Corporation could and did relay figures to Security Pacific based upon Jeannette's accounting data in order to establish its borrowing availability. Finding of Fact 200. Jeannette never exhausted its availability under the line of credit and never asked for an excess advance. Finding of Fact 201–202. The parties also expected that the Security Pacific line of credit would function not as a short term and current liability, but rather would be paid over time. Finding of Fact 165. Based upon the reasonable projections made by the parties as discussed above, on the availability at the relevant time periods, on the cash flow analysis prepared by Mr. Pfingstler, and on Jeannette's historical cash flow needs, we find that the availability under the Security Pacific line of credit was adequate. *See* Findings of Fact 176–202. Jeannette was able to, and did, pay its creditors until it experienced a dramatic downturn in orders and sales. *See* Findings of Fact 203–213. Had Jeannette performed as it was reasonably expected to, the parties projected that the line of credit would have been more than adequate. Finding of Fact 94. The demise of Jeannette was caused by a dramatic sales decline, the continued recession, and mismanagement. Findings of Fact 214–235. Jeannette was not left with unreasonably small capital in its hands after the July 31, 1981, transaction nor was it insolvent in the equity sense.

■ Plaintiff relies upon *Barrett*, 882 F.2d at 4–5, for the proposition that in analyzing whether Jeannette Corporation was left with an unreasonably small capital we must decide whether it was able "to continue operations … in the same manner as it conducted them before the transfer." *Id.* at 5. In support of his contention that Jeannette Corporation was not able to do so, plaintiff offered the expert testimony of Mr. Gustafson regarding the rise in accounts payable in August of 1981, and regarding his comparison of Jeannette's operations under Mr. Brogan with its operations one year before. While we do believe that there probably was a delay in payments to creditors from 30 to 45 days not long after the transfer, Findings of Fact 205, 211, and 212, we are not convinced that this proves Jeannette was insolvent or left with unreasonably small capital. Jeannette was not forced to delay payments to creditors because of the July 31, 1981, transaction. Rather, it was attempting, under Mr. Brogan's direction, to equalize its payments and receipts. *Id.* This decision probably did cause poor creditor relationships. It may have reflected poor business judgment. There is no basis, however, to conclude that this policy reflects that Jeannette had unreasonably small capital. Furthermore, there is no reason for us to find that Mr. Gustafson's "projections" for Jeannette, made for the purposes of his testimony, years after the July 31, 1981, transaction, were any more reasonable than those made by Mr. Brogan or Security Pacific or than the sales projections made by Jeannette's own management.

It is true that Jeannette Corporation was ultimately placed into bankruptcy and in October of 1982 was in a dire financial position. The bankruptcy, however, was caused by a number of complex factors including a continued recession, intense competition from foreign glassware manufacturers, mismanagement of the Jeannette Corporation due to poor communications between the Brogan management and other officers of Jeannette Corporation and, to a lesser degree, Mr. Brogan's illness and inability to attend to the business.[12] Nevertheless, we cannot say that as of July

---

12. We intimate here no view on whether that mismanagement may be a breach of fiduciary duty to the creditors of Jeannette Corporation under Count Six of the amended complaint, which will be tried to a jury.

31, 1981, Jeannette Corporation was unable to meet its obligations as they became mature or was left with an unreasonably small capital in its hands for the continuation of its business. Accordingly, we conclude that the transfers were not constructively fraudulent under 39 Pa.Stat. §§ 354 and 355. Plaintiff has failed to show that he is entitled to recover on Counts Two and Three of the amended complaint.[13]

### Bankruptcy Code

■ In Count Five of the amended complaint, plaintiff relies on 11 U.S.C. §§ 548–9 in attempting to have the court set aside the repayments made by Jeannette Corporation on the initial $11.7 million advance. Under these Bankruptcy Code fraudulent conveyance provisions, we must engage in the same type of inquiry as we did with respect to the Pennsylvania Act.[14] As the Third Circuit has noted:

> the fraudulent conveyance provisions of the Code are modeled on the UFCA, and uniform interpretation of the two statutes is essential to promote commerce nationally....

*Tabor Court*, 803 F.2d at 1299, *quoting Cohen v. Sutherland*, 257 F.2d 737, 741 (2d Cir.1958). *See* 1 Pa.C.S. § 1927 (uniform laws shall be construed so as to effect the general purpose of making law among the various states uniform). For the reasons set forth above with respect to the Pennsylvania Act, we conclude that the plaintiff may not prevail under § 548, to the extent that he can rely on that section.[15]

■ We also conclude that plaintiff has failed to establish that Jeannette's repayments of the Security Pacific loan should be set aside under 11 U.S.C. § 549. That section permits the trustee to avoid a postpetition transfer of property of the estate "that is not authorized under this title or by the court." 11 U.S.C. § 549(a)(1)(B). Plaintiff asserts that Jeannette's repayments to Security Pacific were unauthorized because Security Pacific did not hold an "allowable secured claim against the bankruptcy estate," Amended Complaint, p. 56, because the grant of security interests was a fraudulent conveyance. As set forth above, however, the conveyances involved in the July 31, 1981, transaction were not fraudulent. Therefore, plaintiff has not proven that the repayments of the secured loan were "not authorized." 11 U.S.C. § 549(a)(1)(B).

### Unlawful Dividend and/or Distribution

■ In Count Eight of the amended complaint, plaintiff has sought to recover the $11.7 million initial advance from the defendants under 15 Pa.Stat. §§ 1701 and

---

**13.** Because we conclude that Jeannette was solvent and was not left with an unreasonably small capital in its hands after the July 31, 1981 transaction, we need not reach the question of whether any of the parties, specifically Security Pacific, is protected by 39 Pa.Stat. § 359.

**14.** The Code provides in pertinent part:
> (a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
> (1) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or
> (2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
> (B)(i) was insolvent on the date that such transfer was made or such obligation was

incurred, or became insolvent as a result of such transfer or obligation;
> (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or
> (iii) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

11 U.S.C. § 548.

**15.** Any difference in interpretation of the statutes would actually buttress our conclusion that the plaintiff has failed to demonstrate that the conveyances involved in the July 31, 1981 transaction were fraudulent. To the extent that the statutes differ, the concept of insolvency in the Pennsylvania Act is broader than that in the Code. *In re Glenn*, 108 B.R. at 74; *Larrimer*, 411 Pa. at 608, 192 A.2d at 353. As Jeannette was solvent under the Pennsylvania Act, it clearly was solvent under the Code.

1702.[16] The first cause of action under Count Eight alleges that the stock purchase from Coke of New York by the Brogan defendants constituted an unlawful withdrawal or distribution of corporate assets. The second cause of action asserts that the defendants violated 15 Pa.Stat. § 1702 by paying an unlawful dividend of the purchase price to Coke of New York and/or J. Corp.

Plaintiff sought to recover under both 15 Pa.Stat. §§ 1701 and 1702 under the theory that the corporation was insolvent at the time of the alleged unlawful dividend or distribution.[17] As set forth above, Jeannette Corporation was not rendered insolvent as a result of the July 31, 1981, transaction. Therefore, even if the July 31, 1981, transaction constituted a distribution or dividend, plaintiff cannot recover under §§ 1701 and 1702 of the Pennsylvania Business Corporation Law.[18]

### Conclusion

The demise of Jeannette Corporation, and the resultant harm to its employees, was tragic. Nevertheless, we cannot say, on this record, that it was the result of fraudulent conveyances during the July 31, 1981, leveraged buyout. The law, as it now stands, does not require participants in a leveraged buyout to become insurers of the company's ultimate success. For the reasons set forth above in our findings of fact and legal discussion and conclusions of law, we find that plaintiff is not entitled to relief under Counts Two, Three, Five and Eight of the amended complaint.

---

**16.** While 15 Pa.Stat. §§ 1701 and 1702 have been repealed, and the general subject matter of the provisions of those statutes is now contained in 15 Pa.C.S. § 1551, the provisions of §§ 1701 and 1702 apply here. *See* 1 Pa.C.S. § 1976(a) (repeal of statute does not affect pending civil actions seeking to recover for violation of right existing under the statute).

**17.** The law permitted a corporation to purchase or redeem its own shares unless, in part, a corporation "is not insolvent." 15 Pa.Stat. § 1701 B(4). Similarly, a corporation may declare dividends "except when the corporation is insolvent." 15 Pa.Stat. § 1702 A.

**18.** The defendants also have raised the statute of limitations defense against Count Eight of the amended complaint. Given our conclusion that Jeannette was not rendered insolvent by the July 31, 1981 transaction, we need not address this issue.